Jack GRYNBERG, Plaintiff,

v.

**AMERADA HESS CORPORATION,**
**Defendant.**

Civ. A. No. C–2158.

United States District Court,
D. Colorado.

May 16, 1972.

Raymond J. Gengler, Ted J. Gengler, Denver, Colo., for plaintiff.

Mosley, Wells & Schroeder, by James H. Mosley, Denver, Colo., for defendant; Heidelberg, Woodliff & Franks, Jackson, Miss., of counsel.

## MEMORANDUM OPINION

WINNER, District Judge.

This case was tried to the Court, and at the conclusion of the trial, time was allowed for the filing of briefs. Excellent briefs have been filed by each of the parties, and the case is now ready for decision. This opinion contains the findings and conclusions required by Rule 52.

The underlying facts are not in substantial dispute. The lawsuits stems largely from two written agreements, an agreement of December 27, 1963, between plaintiff, a Colorado citizen, and Hess Oil & Chemical Corporation, and an agreement of February 1, 1965, between the same two parties. Defendant, a Delaware corporation without principal offices in Colorado, has succeeded to the interests and obligations of Hess Oil & Chemical Corporation under those agreements, and more than $10,-000.00 is in controversy, and diversity jurisdiction exists. In accordance with the terminology of the underlying agreements, for the most part, the parties will be referred to in this opinion as "Grynberg" and "Hess."

The agreement of December 27, 1963, was one for the employment of Grynberg by Hess as an independent contractor. He was to utilize his expertise as a petroleum engineer and geophysicist "to conduct oil and gas operations" in Louisiana, Mississippi, Alabama and Arkansas. Regretably, as will be seen later in this opinion, this area definition requires that a Colorado court interpret difficult and obscure provisions of Louisiana and Mississippi statutory and case law. Be that as it may, the agreement was by its paragraph 2 to last for two years or until Grynberg's death, whichever came first, and it set out certain important definitions. The definitions spelled out by the parties were:

"(a) *Program*—The plan described herein to utilize Grynberg's services, information and technical organization as an independent contractor for a two year period in an effort to discover, develop and produce reserves of oil and gas.

"(b) *Prospect*—Land underlain by a limited, contiguous area of geologic interest thought to be located on or associated with a single anomaly or structural condition favorable to the accumulation of oil or gas and which is appropriate in Grynberg's judgment

for the drilling of a well or wells in search of oil or gas.

"(c) *Property Interest*—An oil, gas or mineral lease or interest therein or other right or interest in oil, gas or other minerals or other property, real, personal or mixed, acquired under the terms of this Agreement for the account of Hess."

The agreement required Grynberg to maintain offices in New Orleans "under the name of Hess Exploration Company, a Division of Hess Oil & Chemical Corporation (an assumed name which shall be registered or filed . . . by Hess)." Grynberg was required to assemble technical information in the 4-state area, "together with information on prospective Property Interests on such Prospects, with a view toward Hess either drilling on said Prospects or farming said Prospects out to third parties on advantageous terms." Grynberg was not permitted to acquire oil and gas interests in the area without the consent of Hess, but it was agreed that if Grynberg submitted information to Hess on a Prospect and it was rejected by Hess, Grynberg could acquire that Prospect.

Grynberg's duties are spelled out in minute detail, and in paragraph 6, his potential interests are defined:

"A. Out of the property interests acquired by Hess in each Prospect hereunder Grynberg shall own a net profits interest equal to twenty per cent (20%) of the Net Income, as herein defined, (which 20% net profits interest is hereinafter referred to as Grynberg's 'Net Profits Interest') derived from the ownership and operation of the Property Interests owned by Hess, its successors and assigns, in such Prospect; provided, however, that Grynberg's Net Profits Interest shall be contingent upon the Program realizing an aggregate Net Income at the end of the two year period covered by this agreement, computed in the manner provided below."

The agreement specified detailed accounting procedures to be followed in ascertaining the existence of Net Profits validating Grynberg's interests, and it creates a purchase option in favor of Hess if Hess desires to sell any "Property Interest in a Prospect . . . in which Property Interest and Prospect Grynberg has previously acquired a Net Profits Interest." The agreement is 24 pages long, and we have hit only a selected few of its highlights.

On February 1, 1965, the parties agreed to terminate their relationship under the December 27, 1963, agreement, such termination to be effective as of October 17, 1964. The termination agreement constituted an exchange of mutual releases with a proviso in Grynberg's release of Hess "that Grynberg shall be entitled to any interest as provided for and in accordance with the terms of the Agreement with respect only to the prospects submitted by Grynberg and which are listed on Schedule 'A' attached hereto." Schedule A listed seven prospects:

"1. Breton Sound, Block 30, Plaquemines Parish, Louisiana.

"2. Waynesboro, Wayne County, Mississippi.

"3. Bel Air, Plaquemines Parish, Louisiana.

"4. Bay Springs, Smith County, Mississippi.

"5. Prison Farm, Iberville Parish, Louisiana.

"6. Federal Oil and Gas Leases in Mississippi, Louisiana and Arkansas, acquired for Hess by Grynberg.

"7. Washita-Fredericksburg Oil Pool of the Gitano Field, Jones County, Mississippi."

Of the seven listed prospects, we are really concerned with only three in which plaintiff claims that oil has been discovered. Those three are:

1. Washita-Fredricksburg Oil Pool of the Gitano Field, Jones County, Mississippi.

2. Prison Farm, Iberville Parish, Louisiana.

3. Bay Springs, Smith County, Mississippi.

The principal disputes involve the Bay Springs Prospect which is also referred to in the testimony, in the briefs and in this opinion as the Tallahala Creek Field.

As to the other four exceptions from Grynberg's release of Hess, the record shows:

1. Breton Sound, Block 30, Plaquemines Parish, Louisiana is a Prospect in which defendant acquired a Property Interest. However, a dry hole was drilled, and the area is of no remaining importance.

2. Waynesboro, Wayne County, Mississippi, stands on the same footing as Breton Sound in that no production was obtained.

3. Bel Air, Plaquemines Parish, Louisiana, is again a Prospect in which defendant acquired a Property Interest. It was never drilled and the leases have expired.

4. Federal Oil and Gas Leases in Mississippi, Louisiana and Arkansas acquired for Hess by Grynberg are leases from which defendant has acquired no benefit. Many of the leases have been assigned to plaintiff by defendant, and no dispute concerning any of these leases has been presented to the Court.

The issues to be decided as stated by plaintiff in his brief are:

1. What is a prospect under the terms of the agreement of December 27, 1963, and what is the extent of any prospect under the definitions of that agreement?

2. Were the leases obtained by Grynberg for Hess valid, and, if not, was any invalidity cured by later ratifications?

3. Does the Mississippi rule against perpetuities bar Grynberg from claiming any interest in the Mississippi leases acquired by him for Hess?

4. Does a prescriptive statute of Louisiana bar plaintiff's claim to a net profits interest in the Prison Farm lease?

We answer these questions and the collateral questions inherent in them seriatim.

1. *The definition of a prospect and its extent under the agreement of December 27, 1963.*

It will be remembered that a Prospect is defined as:

"Land underlain by a limited contiguous area of geologic interest thought to be located on or associated with a single anomaly or structural condition favorable to the accumulation of oil and gas and which is appropriate in Grynberg's judgment for the drilling of a well or wells in search of oil or gas."

The argument here focuses on the Tallahala Creek Field, and it builds on a letter of August 19, 1964, written by Grynberg. That letter enclosed three maps and says that the structure conceived centered in Sec. 4, Twp. 1 N., R. 9E. It said, "Principal objective horizon is the Hosston at a depth of 12,300 feet. The prospect is right on the Hosston trend between Martinville, Raleigh, Bryan and Diamond Fields." The letter recommended lease acquisitions of 420 acres in parts of four identified sections. The recommendation was approved by Hess, and 10 leases were acquired. After the relationship between the parties was terminated, R. Merrill Harris & Associates were employed by defendant, and they independently came up with a similar but larger prospect which they recommended to defendant. Twenty-one additional oil and gas leases were acquired by R. Merrill Harris in the area, and a unit agreement was negotiated by them with Shell under which a 1,360 acre unit was formed. Thereafter, the area was drilled, and no production was obtained from the Hosston formation, but production was obtained from the Smackover, 3,000 feet underneath the Hosston. Twenty-three wells were thereafter drilled, and 20 were producers. Of the 20 producing wells, 15 were within the lateral boundaries of the 420 acres recommended by plaintiff. Wells (producers and dry holes) drilled in the four section area

and their relationship to the Shell unit were:

| Well Name & Location | Percentage of Unit Located in the Shell Block |
|---|---|
| Mary G. James #1 W ½ of SE ¼, Sec. 5, T1N, R9E | 100% |
| O. C. James #1 E ½ of SE ¼, Sec. 5, T1N, R9E | 100% |
| E. M. Lane #1 E ½ of NW ¼, Sec. 5, T1N, R9E | 100% |
| E. M. Lane #2 W ½ of NE ¼, Sec. 5, T1N, R9E | 100% |
| E. M. Lane #4 W ½ of SW ¼, Sec. 5, T1N, R9E | 100% |
| Fannye James #1 E ½ of SW ¼, Sec. 5, T1N, R9E | 100% |
| Lane #1 E ½ of NE ¼, Sec. 5, T1N, R9E | 100% |
| W. H. Duckworth #2 W ½ of NW ¼, Sec. 4, T1N, R9E | 100% |
| W. H. Duckworth #1 W ½ of SW ¼, Sec. 4, T1N, R9E | 100% |
| Fannye James #2 W ½ of NW ¼, Sec. 4, T1N, R9E (dry hole) | 50% |
| Fannye James #3 E ½ of NW ¼, Sec. 8, T1N, R9E | 50% |
| O. C. James 2 & 2A E ½ of NE ¼, Sec. 8, T1N, R9E (#2 Well dry hole) | 50% |
| W. E. Wedgeworth Unit W ½ of NW ¼, Sec. 9, T1N, R9E | 50% |
| McMullan Hancock 4–3 #1 E ½ of NW ¼, Sec. 4, T1N, R9E | None |
| L. C. Duckworth Unit E ½ of SW ¼, Sec. 4, T1N, R9E | None |
| Fred James Unit 9–3 E ½ of NW ¼, Sec. 9, T1N, R9E | None |

Wells (producers and dry holes) drilled outside the four section area but still part of the Tallahala Creek Field

and their relationship to the Shell unit were:

| Well Name & Location | Percentage of Unit Located in the Shell Block |
|---|---|
| E. M. Lane #3 E ½ of NE ¼, Sec. 6, T1N, R9E | 100% |
| E. M. Lane #5 W ½ of SE ¼, Sec. 32, T2N, R9E | 100% |
| Lane Shanks Unit E ½ of SE ¼, Sec. 6, T1N, R9E | 50% |
| Sartar W ½ of NE ¼, Sec. 6, T1N, R9E | None |
| Duckworth-Eaton-James W ½ of SE ¼, Sec. 4, T1N, R9E | None |
| McMullan-Hancock 4–2 W ½ of NE ¼, Sec. 4, T1N, R9E (dry hole) | None |

To accomplish the drilling of the wells, defendant agreed to transfer an interest in the wells to R. Merrill Harris for their services, and, as its share of the drilling costs, defendant assigned to others 40% of its interest in the wells in which it participated. There was nothing wrong with this. It was authorized by the agreement of December 27, 1963. That agreement said:

"(Paragraph 6–D) . . . Hess shall not be obligated to Grynberg for failure to explore and develop any Property Interests in a Prospect, or for failure to continue any lease or other interest in force, and Grynberg shall, and does hereby, grant Hess the right to take any action deemed necessary or desirable in connection with such Prospects, including but not limited to the right to release Property Interests and the right to pool and unitize any Property Interests obtained in a Prospect and thereby to totally or proportionately reduce the Net Profits Interest to which Grynberg is entitled." (1)[1]

Accordingly, Grynberg's interests are subject to the unit agreement and to

---

1. Other provisions of the agreement defining and discussing "Property Interests" fortify this conclusion, but to set forth those provisions in full in this memorandum opinion would unduly extend it.

these assignments to defendant. The unit agreement was entered into and the assignments were made in furtherance of an entirely legitimate and proper business purpose of defendant's, and they are not subject to challenge by Grynberg. The sense of the agreement between the parties was that Hess would be given management responsibilities and discretion in the development of the property, and that Grynberg would be bound by any good faith decisions of Hess. These were good faith decisions, and Grynberg is bound by and subject to them. We hold that Grynberg's net profits interest is the agreed percentage of the residual interest of defendant after the unit agreement and the good faith assignments made by it to further development of the area.

■ In arguing about the definition of a prospect and its extent, the parties differ as to its horizontal and vertical boundaries or limits. We agree with plaintiff as to the vertical boundaries and with defendant as to the horizontal boundaries.

We first consider the vertical boundaries. Grynberg's letter of August 19, 1964, said that the "Principal objective horizon is the Hosston at a depth of 12,300 feet." As has been mentioned, there was no recovery from this formation, and production was obtained 3,000 feet deeper from another geologic formation. Defendant vigorously argues that although Grynberg might be entitled to share in production from the Hosston or from a shallower depth, he is not entitled to participate in this deeper production from the Smackover because this production was not contemplated by him, and he did not recommend drilling to that depth. Grynberg said that he is entitled to share in production within the horizontal boundaries no matter what depth the production comes from. Defendant's argument is appealing, and, if this were a matter for resolution by the Court as a matter of law, without reference to expert testimony, the Court might well adopt defendant's position. However, it is to be noted that the par-

ties defined a "Prospect" in their agreement, and, throughout the agreement the word "prospect" is capitalized and is used as a proper noun rather than as a common noun. Accordingly, the holding in this opinion is limited to a definition of the proper noun used in the agreement of December 27, 1963, and it should not be construed as a judicial definition of the common noun "prospect." As Judge Phillips said in United States v. Continental Oil Company (1966 10 Cir.) 364 F.2d 516:

"The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties at the time their minds met upon the terms of the agreement.

"Ordinarily, the construction of a contract presents a question of law, to be determined by the court.

"Where, however, to ascertain the meaning of the terms in a contract, resort must be had to extrinsic evidence, and the evidence is in conflict or more than one reasonable inference may be drawn therefrom, a question of fact, rather than law, is presented.

"When technical terms are used in a contract and are not therein defined, and resort must be had to the testimony of experts with respect to their meaning, the meaning of such terms becomes a question of fact for determination by the trier of the facts."

Here we have a proper noun defined in the contract, and we have expert testimony saying that "Prospect" as used in the contract as a defined technical term meant that the prospect included production from any depth, above or below that predicted by Grynberg. We do not have a situation where there is a conflict in the expert testimony to be resolved by the Court as the trier of the facts. We have a record where the experts for both plaintiff and defendant agreed that this is the contractual meaning of the term. As the trier of facts, we are bound by the uncontradicted record in determining the meaning of the technical term. As used in this contract, the proper noun "Prospect" includes production

from any depth within the horizontal boundaries of the "Prospect."

We next consider the horizontal boundaries of the "Prospect" described in Grynberg's letter of August 19, 1964. That letter was accompanied by maps and the property description we have already mentioned. The isopach maps showed a sort of a slanted "U" shaped area, and the "U" wasn't closed into an oval to define the area with any certainty. The land descriptions contained in the letter pretty well define the area which Grynberg thought constituted the "Prospect," and certainly Hess had no way of knowing that Grynberg would claim a right to share in production from other lands later acquired as a result of the work of R. Merrill Harris, and lying outside the lands described in Grynberg's letter. As to the Tallahala Creek Field, we hold that Grynberg's claim is limited to wells drilled on land described in his letter of August 19, 1964—the 420 acres, limited to the 10 leases acquired by him in that area, which leases were taken in the name of Hess Exploration Company, all subject, of course, to our earlier holding concerning the good faith assignments made by defendant.

With this, then, we believe that we have answered the first question presented.

2. *The claimed invalidity of the leases and the asserted cure of that invalidity by later ratification.*

Defendant argues that Grynberg is entitled to nothing under the agreement because the leases were acquired in a fictitious name and were therefore illegal and void. In its recitals, the contract said that one contracting party was "Hess Oil & Chemical Corporation, a Delaware corporation (herein called 'Hess')." It required Grynberg to maintain offices "under the name of Hess Exploration Company, a division of Hess Oil & Chemical Corporation an assumed name which shall be registered or filed, as may be required by law, by Hess," and it said in paragraph 4–D that "all interests . . . shall be ac-

quired in the name of Hess." Grynberg took the leases in the name of "Hess Exploration Company," but he failed to add to the name of the lessee the phrase "a division of Hess Oil & Chemical Corporation." Defendant says that this is fatal to the validity of the leases, and, seemingly, this thought occurred to the Hess title lawyers earlier, because R. Merrill Harris & Associates obtained ratifications of the leases after Grynberg's relationship with Hess was terminated.

It is true that the "ratifications" say that the landowners "do hereby lease, demise and let" the property to Hess Oil & Chemical Corporation, but they also say:

". . . we, the undersigned, do hereby ratify, adopt, approve and confirm the said lease in all of its terms and provisions—as fully and completely as if he had executed, acknowledged and delivered the same in our own proper person, and we do hereby agree and declare that said lease in all of its terms and provisions is binding on us and is a valid and subsisting oil, gas and mineral lease."

The briefs argue pro and con the holding of Parsons v. Marshall (1969) 243 Miss. 719, 139 So.2d 833. The argument centers on the question of whether under the law of Mississippi, the leases were void as being leases to a fictitious person or whether they are valid as being leases to an actual person acting under an assumed name. Pertinent language by the Mississippi Supreme Court is:

"The rule that, where an instrument purporting to be a deed and which has no grantee named therein, in esse, a person in being, or corporation, is void, is so well-established in Mississippi that it is no longer doubtful. . . .

"'The rule that a deed which names as grantee a fictitious person is void is based upon the physical nonexistence of the grantee named, and care must be taken to distinguish between a deed to a fictitious person who has no existence and to a person in exist-

ence who is described by a fictitious or assumed name. If a living or legal person is identifiable as the grantee named in the deed, the deed is valid * * * In other words, if a living or legal person is intended as the grantee and identifiable, the deed is valid however he may be named in the deed.' "

■ Based upon our reading of *Parsons* and other Mississippi cases cited by it, we confess uncertainty in attempting to apply Mississippi law, but we hold that on the facts here present, the leases were in legal effect leases "to a person in existence who is described by a fictitious or assumed name," and that a "legal person (was) intended as the grantee and (was) identifiable." We hold that the leases were valid.

■ However, if we are in error in this conclusion, we have no hesitancy in holding that the later instruments obtained by R. Merrill Harris & Associates were in fact ratifications rather than new leases. The language of the ratifications re-leasing the lands was precautionary only, and read as a whole, these instruments must be taken and held to be true ratifications which gave life to the earlier leases if they were in fact subject to challenge.

### 3. *The Mississippi Rule Against Perpetuities.*

■ Defendant argues that Grynberg's claim to Net Profits Interests in the Mississippi production cannot be enforced under the Mississippi rule against perpetuities, and the parties agree that the question should be decided under Mississippi law.

Defendant's statement of the Mississippi rule against perpetuities is:

"No interest subject to a condition precedent is good, unless the condition must be fulfilled, if at all, within 21 years after some life in being at the creation of the interest, or, stated differently, no interest is good unless is must vest, if at all, not later than 21 years after some life in being at the creation of the interest."

Defendant argues that because Grynberg's right to share in profits is conditioned upon the realization of a future income stream which will produce a net profit, this may not happen during a life in being plus 21 years. Also, defendant says that the rule could apply to bar any interest Grynberg might claim in future leases, but in light of that which we have already held, we need not consider the applicability of the rule to future leases, and we limit our thinking to the 10 leases he did acquire.

To define Mississippi law, defendant relies on Thomas v. Thomas (1910) 97 Miss. 697, 53 So. 630; Nichols v. Day (1922) 128 Miss. 756, 91 So. 451; McCormack v. Blanks (1956) 226 Miss. 767, 85 So.2d 204; Magee v. Magee's Estate (1959) 236 Miss. 572, 111 So.2d 394; and Carter v. Berry (1962) 243 Miss. 321, 136 So.2d 871, 140 So.2d 843.

Plaintiff says that these cases are water under the bridge, and that Mississippi adopted the "second look" or "wait and see" rule in Phelps v. Shropshire (1966) 254 Miss. 777, 183 So.2d 158, 20 A.L.R.3d 1086, and, says plaintiff, since the contingency of a realized net profit has already occurred, the punitive and technical aspects of the rule should not apply. Defendant responds by saying that *Phelps* should be limited to its own facts and, says defendant, the case does not represent a basic change in the Mississippi rule against perpetuities.

It is unfortunate that a Colorado court is called upon to decide this close question of Mississippi law, but there appears to be no escape from the chore.[2] We note that *Phelps* cites with approval Merchants National Bank v. Curtis (1953) 98 N.H. 225, 97 A.2d 207, and

---

2. On this question and on the question of the Louisiana prescriptive statute the parties are surely not confronted with any presumption applicable to decision of a trial judge familiar with local law. Denning v. Bolin Oil Co. (1970 10 Cir.) 422 F.2d 55.

the New Hampshire Court in turn relied on Sears v. Collidge (1952) 329 Mass. 340, 108 N.E.2d 563, both of which adopted the "second look" or "wait and see" doctrines as the law of New Hampshire and Massachusetts.

We agree with plaintiff that *Phelps* does represent a change in Mississippi law insofar as the rule against perpetuities is concerned, and it is comforting to observe that the annotator in 20 A.L. R.3d 1094 shares our view. Even without the adoption of the "wait and see" rule, as a matter of practical business judgment, it is difficult to conceive of an oil field which would be operated without realizable profit for 21 years beyond a life in being, and here plaintiff says that the profit is already in being, and that his interest is already vested.

We hold that plaintiff's claim to a Net Profits Interest in the 10 leases acquired by him in the Tallahala Creek Field is not invalidated under the Mississippi rule again perpetuities.

4. *The applicability of the Louisiana prescriptive statute to the Prison Farm Lease.*

■ In approaching our determination of the applicability of a Louisiana prescriptive statute to Grynberg's claimed Net Profits Interest in the Prison Farm lease we are not cheered by the comment of the Louisiana Court of Appeal in Succession of Simms (1965) 175 So.2d 113, affirmed 250 La. 177, 195 So. 2d 114, that "Louisiana mineral law, which, to say the least, is already confused." Indeed it is. We must decide whether plaintiff's claimed Net Profits Interest in the Prison Farm lease prescribes if the contractually defined net profit doesn't occur within the statutory 10-year period.

Plaintiff argues that the interest is not an immovable under Louisiana law and that it is not subject to the prescriptive statute. Defendant says that the interest is fairly comparable to an overriding royalty; that it is an immovable and that it is subject to prescription at the end of 10 years. Vincent v. Bullock

(1939) 192 La. 1, 187 So. 35, and Union Sulphur Company v. Andrau (1950) 217 La. 662, 47 So.2d 38, held that a reserved landowner's royalty was an immovable and that it prescribed under the statute. Ascher v. Midstates Oil Corp. (1953) 222 La. 812, 64 So.2d 182, held that an overriding royalty was not an immovable, and that it did not prescribe, presumably on the theory that an override is appended to the lease and not to the land itself. If *Ascher* represents the present law in Louisiana, the Net Profits Interest would seem to be more comparable to an override than to a landowner's reserved royalty, and if *Ascher* is good Louisiana law today, the prescriptive statute would not apply to Grynberg's Net Profits Interest in the Prison Farm lease. *Succession of Simms,* supra, sets forth the Louisiana statutory history and discusses earlier cases. We gather from *Succession of Simms* that with an awareness of the Louisiana Court's decisions in *Ascher* v. Midstates Oil Corp., supra, and Reagan v. Murphy (1958) 235 La. 529, 105 So.2d 210, the Louisiana legislature adopted present L.S.A. Code of Civil Procedure, Article 3664, in 1960. That section provides:

"A mineral lessee or sublessee, owner of a mineral interest in immovable property, owner of a mineral royalty, or of any right under or obligation resulting from a contract to reduce oil, gas, and other minerals to possession, is the owner of a real right. These rights may be asserted, protected, and defended in the same manner as the ownership or possession of immovable property, and without the concurrence, joinder, or consent of the owner of the land."

Reagan v. Murphy, supra, held that a mineral lease was not subject to prescription under the 10-year statute because it was a personal contract, and that the statute was applicable only to real rights or immovables as defined under Louisiana law. We think that the 1960 Act effectively changed the rule of *Ascher* and *Reagan* and that those decisions no longer control. The statute by its terms ap-

plies to "any right under or obligation resulting from a contract to reduce oil, gas, and other minerals to possession." Such rights are by statutory definition said to be immovables. We see no alternative to holding, and we hold that because of the 1960 amendment to the Louisiana Code, *Ascher* is no longer determinative of the question, and we hold that because of the statutory amendment, Grynberg's Net Profit Interest in the Prison Farm lease is subject to the Louisiana 10-year prescriptive statute.

This, then, disposes of the issues listed and discussed in plaintiff's brief, and we make quick mention of other questions in the case. We have not talked about the Washita-Fredericksburg Oil Pool of the Gitano Field, Jones County, Mississippi, problem. Although this area was listed in Schedule A of the February 1, 1965, agreement, it was not a mineral interest acquired by Hess as a result of Grynberg's efforts under the December 27, 1963 contract. Hess owned the Washita-Fredericksburg Oil Pool interest before its contract with Grynberg was entered into, and that interest can by no stretch of imagination be thought to be a Property Interest acquired under the Hess-Grynberg contract. Grynberg did furnish some advice concerning reentry and completion of the well, but the compensation, if any, to which he is entitled for that advice is not to be determined by the written agreement between the parties.

Although the parties have filed protective briefs discussing quantum meruit recovery, those briefs are aimed at the possibility that all of Grynberg's claims under the written agreement would be rejected by the Court under one or more of defendant's arguments, and they are not aimed at quantum meruit recovery by him for his advice concerning the Washita-Fredericksburg Oil Pool reentry problem. Insofar as the target question of the quantum meruit briefs are concerned, our decision disagreeing in part with defendant's arguments makes unnecessary any ruling on those briefs. Insofar as Grynberg's right to recover in quantum meruit for his work on the Washita-Fredericksburg Oil Pool reentry problem is concerned, plaintiff does not even list the question in his brief as one which he wants decided, and there is no evidence in the record which would permit determination of the question. It is not and cannot be decided on the record made. The only thing we can say about plaintiff's right to recover for services provided in connection with the Washita-Fredericksburg reentry is that he is not entitled to a "Net Profits Interest" in the Washita-Fredericksburg Oil Pool under the provisions of the agreement of December 27, 1963.

By counterclaim, defendant has asked declaratory relief as to its future duties and obligations. Again, what we have heretofore decided eliminates need for further discussion of the counterclaim, but if there is any remaining uncertainty, we hold that plaintiff's claim to a Net Profits Interest is limited to Net Profits Interests flowing from Property Interests in Prospects acquired under the leases plaintiff obtained while he was working under the contract of December 27, 1963.

Plaintiff is entitled to an accounting to determine the net profits earned under the 10 leases he acquired for Hess pursuant to the contract of December 27, 1963, but he is entitled to that accounting only.

Each party shall pay his and its own costs.