Luella NANTT and Lloyd Nantt, wife and husband; LaVerne Oster, Attorney-in-Fact for Paul E. Rockstad, and Paul E. Rockstad; Gerald R. Rockstad, a/k/a Gerald Rockstad and Anita A. Rockstad, husband and wife; Ronald C. Christianson and Patricia A. Christianson, husband and wife; Eddy D. Nelson and Mary Ellen Nelson, husband and wife; Inga Sandry; Jennie E. Stedman and Virgil L. Stedman, wife and husband, Plaintiffs and Appellees,

v.

PUCKETT ENERGY CO., 215 Security Life Building, Denver, CO, Defendant and Appellant.

Civ. No. 10976.

Supreme Court of North Dakota.

Feb. 20, 1986.

---

Malloy & Malloy, Dickinson, for plaintiffs and appellees; argued by Harry L. Malloy.

Bjella, Neff, Rathert, Wahl & Eiken, Williston, for defendant and appellant, argued by Paul W. Jacobson, appearance by William Bergman, House Counsel for Alfson Energy Company.

MESCHKE, Justice.

Puckett Energy Company appeals from a $72,000 judgment in favor of plaintiffs ("Rockstads") on Puckett's second drafts for additional bonus for its separate top leases of oil and gas of the Rockstads' individual undivided mineral interests under a half-section in Williams County. Puckett claims that a special clause in its top leases gave Puckett the option of paying the second drafts or, alternatively, that its top leases were void under the rule against perpetuities. We reject both claims and affirm the judgment.

Rockstads are relatives who own various fractions of the minerals under the half-section. In 1981, their interests were subject to existing individual oil and gas leases for primary terms due to expire at various dates in 1982 and 1983, if there were no timely drilling and production of oil or gas.

In 1981, Puckett sought top leases from the Rockstads, designed to take effect when the existing leases expired without production.[1] The broker soliciting for Puckett used its printed form of oil and gas lease with several additional paragraphs attached as typewritten "riders," including the following:

"This lease is presently subordinate to an existing oil and gas lease dated March 28, 1977, recorded in book 206M, Page 145, of Williams County, State of North Dakota, the primary term of which expires 3–28–82, and lessor covenants and agrees not to further extend, amend, or modify said existing lease after termination for any reason. Lessee shall be obligated (1) to pay or tender to lessor as additional bonus or to the lessor's credit in the Union Bank, at Halliday, ND 58636, or it [sic] successors, the sum of ten dollars ($10.00) and more per mineral acre, as agreed upon by the parties hereto and as tendered herewith, for each mineral acre under those portions of the described premises which lessee desires to retain, if any under the provisions of this lease and, (2) to release this lease as to all portions of the described premises for which lessee has not paid such additional bonus. In addition, lessee shall tender to lessor, at the same time and in the same manner as provided herein for the payment of additional bonus consideration, a sum equal to one dollar ($1.00) per mineral acre retained by lessee for each year of the primary term of this lease as delay rental payment for the term of this lease. In the event the existing lease terminates before the expiration of its primary term, lessor shall give lessee, at the above address, written notice of such termination and lessee shall have ten (10) working days from receipt of said notice to tender to lessor the additional bonus consideration and delay rental payment as provided herein. Notwithstanding anything to the contrary contained in this lease, the effective date of this lease shall be the date(s) upon which the existing lease terminates, for whatever reason, and as to any or all of the lands contained therein. This lease shall run for a term of three (3) years from said effective date subject to the provisions contained in this lease."

Each Rockstad family member executed such a three-year top lease in July 1981. Upon execution and delivery of each lease, each Rockstad family member received two drafts. One draft was for $100 per mineral acre owned by that lessor, payable 45 days from sight. The second draft was for $300 per mineral acre owned by that lessor, payable 30 days after the specified date upon which that lessor's existing lease would expire without development in 1982 or 1983. Each draft of the second set recited "[c]onsideration for oil and gas lease dated [date inserted] covering lands in Williams County, ND" and "[o]n 30 days after [date inserted] subject to approval and acceptance of title."

The first set of drafts for $100 per acre were paid and the top leases were recorded by Puckett. The "bottom" leases expired without drilling or production, but the second drafts for $300 per acre were not paid, (except Norman Rockstad's which Puckett claims was paid by mistake).

Puckett filed releases of record seven months after the second set of drafts were due on five of the Rockstad leases, five months later for one of them, and shortly before the due date for the last one in 1983.

The Rockstads sued for payment of the second set of drafts in September, 1983. Puckett's principal defense was "that payment of the second draft ... was optional on the part of [Puckett] should it decide to

1. In *Norman Jessen & Associates v. Amoco Production Company*, 305 N.W.2d 648 (N.D.1981) at 649, footnote 2, we identified a "top lease":

"The term 'top lease' is defined in Williams and Meyers, (4th Ed.1976) Manual of Oil and Gas Terms, p. 606, as:

'A lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated.'"

retain the interest in the acreage ..." because of the following in the rider:

"Lessee shall be obligated (1) to pay ... additional bonus ... as agreed upon by the parties hereto and as tendered herewith, for each mineral acre ... which lessee desires to retain, if any under the provisions of this lease and, (2) to release this lease as to all portions of the described premises for which lessee has not paid such additional bonus."

Puckett also argued the top leases were void as an indefinite suspension of the power of alienation in violation of § 47–02–27, N.D.C.C.

The trial court rejected both arguments. It viewed the special rider provision as ambiguous, construed it in favor of the lessors under *West v. Alpar Resources, Inc.*, 298 N.W.2d 484 (N.D.1980), and held that the second draft comprised a part of the agreement. Since the second drafts were conditioned only upon "approval and acceptance of title" and since the underlying leases expired without drilling or production so that the top lessee had title, the trial court concluded Puckett was obligated to pay the second drafts. The trial court also pointed out that Puckett's delay in filing releases of record was not reasonable.[2] On the second issue, the trial court held that the power of alienation was not suspended by these top leases because the top lessee was "capable of making a conveyance."

On appeal, Puckett argues that under the special rider it "was not required to pay on the second draft[s] if for some reason the particular prospect could not be put together" and points to evidence that it was unable to obtain lease interests which it desired in adjacent acreage as justification for not paying the second drafts. Puckett argues that the special provision "clearly and unambiguously" gave it an unqualified

option to pay the second drafts because the second drafts evidence only the amount of the additional bonus to be paid, which was not spelled out in the top leases, and therefore should be looked at only for that purpose.

There is a recognized "contemporaneous execution" rule which requires instruments relating to the same transaction and executed at the same time to be read and construed together. *Wayne v. Braun*, 292 N.W.2d 578, 580 (N.D.1980); § 41–03–19, N.D.C.C. (U.C.C. 3–119); 11 Am.Jur.2d *Bills and Notes* § 70 (1963); 17 Am.Jur.2d *Contracts* § 264 (1964); *Restatement (First) of Contracts* § 235 (1932). Thus, it was not error for the trial court to construe the drafts together with the top leases.

We believe that the trial court properly concluded, as a matter of law, that an ambiguity existed in the contemporaneously executed documents. *Johnson v. Mineral Estate, Inc.*, 343 N.W.2d 778 (N.D. 1984) ("Mineral Estate I"). Therefore, extrinsic evidence was properly considered to ascertain the intention of the parties. *Johnson v. Mineral Estate, Inc.*, 371 N.W.2d 136 (N.D.1985) ("Mineral Estate II"). A choice between two permissible views of the evidence is not clearly erroneous where the trial court's findings are based upon documentary evidence, inferences from other facts, or credibility determinations. *Stracka v. Peterson*, 377 N.W.2d 580 (N.D.1985); *Mineral Estate II, supra.*

The reasoning of the trial court is appropriate:

"Contrary to [Puckett's] contention, paragraph 14 does not clearly state that it may terminate the lease for any reason by nonpayment of the second draft. The language relied upon by [Puckett] as granting absolute discretionary authority

---

**2.** N.D.C.C. § 47–16–36 provides:

"When any oil, gas, or other mineral lease heretofore or hereafter given on real property situated in any county of North Dakota and recorded therein shall terminate or become forfeited it shall be the duty of the lessee, his successors or assigns, within fifteen days after

the date of the termination or forfeiture of any such lease, to have such lease surrendered in writing, such surrender to be signed by the party making the same, acknowledged, and placed on record in the county where the leased real property is situated without cost to the owner thereof. * * *"

to terminate the lease is consistent with the [Rockstads'] understanding of the document. Obviously [Puckett] would not desire to retain the top lease if the primary term of the bottom lease had been extended by drilling activity.

\* \* \* \* \* \*

"If [Puckett] intended to provide itself with either an option to lease, or an absolute right to terminate for any reason, it could have very simply so stated."

Since the second drafts for the additional bonus were issued contemporaneously with execution of the top leases and were conditioned only upon "approval and acceptance of title," we cannot conclude that the trial court's findings were clearly erroneous. *Mineral Estate II, supra.* There is evidence to support the trial court's findings as to the intention of the parties to the top leases and the accompanying drafts. Therefore, we affirm the trial court's determination on this point.

Puckett's second contention is that it should not have to pay for these top leases because they are void and unenforceable under the rule against perpetuities set out in § 47–02–27, N.D.C.C.

> *"Suspension of power of alienation— Rule against perpetuities.* The absolute power of alienation cannot be suspended, by any limitation or condition whatever, for a longer period than during the continuance of the lives of persons in being at the creation of the limitation or condition and twenty-one years."

Puckett's argument is that commencement of the primary term of a top lease after expiration of a prior oil and gas lease, which may possibly be extended indefinitely beyond its primary term by drilling and production, would violate the principle of remoteness of vesting reflected in the rule against perpetuities. Puckett cites *Carlson v. Tioga Holding Company,* 72 N.W.2d 236 (N.D.1955) and *Johnson v. Fitzmaurice,* 127 N.W.2d 497 (N.D.1964) which held that the conveyance of mineral interests to a trustee of a trust for ten years and so long thereafter as oil, gas or other minerals are produced on any trust lands was void under this statutory rule against perpetuities. Puckett also relies on an observation made in *Siniard v. Davis,* 678 P.2d 1197 (Okl.Ct.App.1984), that commencement of the primary term of a top lease after expiration of a bottom lease which had been extended beyond its original term by production would violate the rule against perpetuities.

While it was once thought that "[t]opleasing has the same invidious characteristics as claim jumping",[3] top leasing has become a useful and widespread business practice in the oil and gas industry in North Dakota, as well as in other regions.[4] Since a common commercial practice in the oil and gas industry is challenged here, we consider the issue of validity of these top leases under the rule against perpetuities more extensively than the sparse appellate briefs might otherwise justify.

■ Oil and gas leases are interests in real property in North Dakota. *State v. Amerada Petroleum Corporation,* 78 N.D. 247, 49 N.W.2d 14 (1951); *Messersmith v. Smith,* 60 N.W.2d 276 (N.D.1953); *Petroleum Exchange v. Poynter,* 64 N.W.2d 718, 726 (N.D.1954). Thus, interests in oil and gas leases may be subject to

**3.** *Frankfort Oil Company v. Snakard,* 279 F.2d 436, 445, n. 23 (10th Cir.1960), *cert. den.,* 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

**4.** Ernest, *Top Leasing—Legality v. Morality,* 26 Rocky Mountain Mineral Law Institute 957, 968–972 (1980); Note, *The Rule Against Perpetuities: The Validity of Oil and Gas Top Leases and Top Deeds in Texas After Peveto v. Starkey,* 35 Baylor Law Review 399, 409 (1983):

> "Top leases are an accepted business practice because they increase actual drilling and competitiveness. Oil companies whose leases have been topped have greater incentive to drill on leased lands because they cannot keep a claim on large blocks for successive primary terms by waiting until the end of the primary term to take a renewal. The owner of the bottom lease must either drill or lose his lease. Furthermore, in addition to increasing drilling and production, top leasing helps small independent oil companies get leases in thickly leased lands controlled by the major oil companies."

the rule against perpetuities in proper cases. But, the usual lease for a term of years and "so long thereafter as oil and gas is produced" is "seemingly impregnable under the Rule." 2 H. Williams and C. Meyers Oil and Gas Law § 322; 4 Restatement of Property § 399 comment a, illustrations 3 and 4 (1944). "[I]t is well established law that no such conflict exists" with the rule against perpetuities for such "profit" leases primarily because "[t]he 'expansible aspect' of some such interests can be thought of as the progressive utilization, in its entirety, of an interest fully created at the beginning …;" 4 Restatement of Property § 399 comment a (1944). *See also, Montana Consolidated Mines Corporation v. O'Connell,* 107 Mont. 273, 85 P.2d 345 (1938) and *Moffit v. Sederlund,* 378 N.W.2d 491, 498 (Mich.Ct.App.1985).

Nevertheless, there are some interests related to oil and gas leasing where sufficiently definitive decisional law has not accumulated to "settle" the subject. "Top leasing" is apparently one of them. 2 H.

Williams and C. Meyers, Oil and Gas Law § 322. Thus, our analysis must be based on generally applicable principles rather than specific accumulation of precedent.[5] And, we are mindful of the suggestion of some scholars of the subject that it is a serious matter to strike down a commercial bargain, freely entered into, unless a significant threat to the public interest exists.[6]

If construed, as Puckett desires, as options to lease exercisable whenever the bottom leases expire, these top leases might offend the rule against perpetuities because, when they were created, there was the possibility of production under the bottom leases which would extend the option for the top leases indefinitely. *See* § 47–02–31, N.D.C.C. Conceivably, the top leases would not vest in possession "for a longer period than during the continuance of the lives of persons in being at the creation of the limitation or condition and twenty-one years," the restriction imposed by § 47–02–27, N.D.C.C. At common law,

**5.** In this complex field, with its ancient roots and arcane growth, the occasional student (as most judges and lawyers necessarily are) needs scholarly maps to locate the enduring kernels of principle amid the chaff of antiquity. 4 Restatement of Property (1944) offers that kind of organized guidance.

The rule against perpetuities evolved from centuries of common law tradition in the English courts seeking to keep property free from "inconvenient fetterings." This long tradition apparently rested upon reasons of social policy requiring restrictions upon "fettering of property" which have carried forward to today. The surviving complex of purposes served by the rule against perpetuities is summarized in 4 Restatement of Property (1944), Introductory Note to Part I on The Common Law Rule Against Perpetuities at 2132.

North Dakota derived a modified statutory pattern of the rule against perpetuities, stemming through the Field Code and sharing a common derivation with similar statutes in 13 other states including New York and California, as well as South Dakota and Montana. *See* 4 Restatement of Property (1944), Introductory Note to Appendix on The Statutory Rules Against Perpetuities, at 2627–2631, particularly at 2629, and Appendix B, particularly at ¶ 1 and 2, ¶ 15, ¶ 24, ¶ 62, ¶¶ 63–65, and ¶ 72. Our statutory heritage reflects rules of the common law to a significant degree, but there are equally significant modifications and supplements to

the common law in our statutory pattern which are not susceptible of succinct outline. *See* 4 Restatement of Property (1944), Appendices A and B (encompassing 192 pages).

**6.** 2 H. Williams and C. Meyers, Oil and Gas Law § 322:

"… if draftmanship should fail to eliminate technical objections based on the Rule against Perpetuities, the courts should remember the history and policy of the Rule and should refuse to invalidate a commercial transaction that does not affect the free alienability of property."

Curran, *Effect of Amendments to Petroleum and Natural Gas Leases,* 4 Alberta Law Review 267, 285 (1965):

"Perhaps it is an extreme view to suggest that the law should be reformed so that the Rule against Perpetuities does not apply to commercial options of any kind; however, it is a serious matter to strike down a disposition in the name of public policy and it is even more serious to strike down a bargain freely entered into where no threat to the public interest can be shown to exist. An examination of the cases in which options have been invalidated will reveal a series of episodes in which lawyers have enabled owners to escape from obligations freely assumed; it will reveal few, if any cases in which the performance of these obligations would have caused any detriment to the public."

an option was invalid because of the rule against perpetuities when it could continue for a period longer than the maximum proscribed. *See* 4 Restatement of Property § 393 (1944), and comments g and j to that section.[7]

■ But, the construction urged by Puckett is not the one made by the trial court. The trial court concluded that the options for the top leases contained in the rider provisions were exercised by the immediate issuance and delivery of the second drafts for the additional bonus, conditioned only upon "approval and acceptance of titles" i.e., expiration of the underlying leases in 1982 and 1983 without extension by drilling or production.

We observe that this construction of the transactions is equivalent to the construction made in *Siniard v. Davis, supra*, cited by Puckett. In *Siniard v. Davis*, the Oklahoma Court of Appeals held in favor of a top lessee against the lessors for a breach of warranty of title because a producing well extended the primary term of the bottom lease, so that lessors were unable to furnish good title to the top lessee. One reason for that construction was that an alternate construction might violate the rule against perpetuities.

■ This Court has held that, in case of ambiguity, the construction resulting in validity under our statutory rule against perpetuities is preferred. *In Re Gray's Es-*

*tate*, 27 N.D. 417, 146 N.W. 722 (1914). Other states with commonly derived statutory patterns also hold that the legally more effective construction is preferred. *In Re Bruckheimer's Estate*, 193 Misc. 414, 38 N.Y.S.2d 146 (1942); *In Re Phelps' Estate*, 182 Cal. 752, 190 P. 17 (1920); *Atwater v. Russell*, 49 Minn. 22, 51 N.W. 624 (1892). That was the common law rule. 4 Restatement of Property § 375 (1944). Thus, the trial court's construction in this case accords with a cardinal rule of construction of future interests: make the intention of the conveyor effective if another construction would defeat it. We have upheld the trial court's construction for other reasons, but we observe that it is most appropriate for this reason.

■ There is another rationale for the validity of these top leases under the rule against perpetuities. A "second look" or "wait and see" doctrine has developed in modern times. Restatement (Second) of Property (Donative Transfers) § 1.4 reporter's note (1983). While this rule is still evolving and is not yet a prevailing rule, it is a basic common sense approach to "perpetuities" today. It is an alternative better than condemning modern commercial transactions for conflicting with ancient rules of property. Moreover, it has been applied to interests in oil and gas leases. *Grynberg v. Amerada Hess Corporation*, 342 F.Supp. 1314 (D.Colo.1972). Since there was no extension of the bottom leases by

---

7. However, under the provision comparable to § 47-02-27, N.D.C.C., which was adopted in New York, an option to purchase an interest in real property does not "suspend the power of alienation" and therefore it does not ordinarily have to comply with the statutorily permissible period as to duration, since the giver and recipient of any such option can at any time, by uniting, convey a fee in possession. *In Re Water Front on Upper New York Bay*, 246 N.Y. 1, 157 N.E. 911 (1927), *cert. denied*, 276 U.S. 626, 48 S.Ct. 320, 72 L.Ed. 738 (1928). *See* Appendix Chapter A at ¶ 12, 4 Restatement of Property (1944), noting this New York statutory difference from the common law. *See also*, 2 L. Simes, *Law of Future Interests* § 512, n. 89 (1936), noting that "[t]he validity of unlimited option contracts has been sustained under statutes prohibiting only the suspension of the absolute power of alienation" in other states with

similarly derived statutory patterns, such as California, Minnesota, and Michigan. While North Dakota has not apparently considered this issue, these precedents, because of the common derivation and similarity of the pertinent statutes, "are persuasive and should not be ignored." *Becker v. Becker*, 262 N.W.2d 478, 483 (N.D. 1978).

The trial court's conclusion in this case, that the power of alienation was not suspended because the top lessee was "capable of making a conveyance," seems to have been premised upon a rationale akin to that described above. Since we determine that rules of construction control this case, we do not need to decide whether this "option" principle extends to an option granted to a third-party for a leasehold estate identical to an "expansible" leasehold outstanding, which is contingent upon termination of the outstanding leasehold estate.

production in this case, no violation of the rule against perpetuities by indefinite suspension of Puckett's possession of the oil and gas rights under its top leases has occurred.[8]

For the reasons stated, we affirm the judgment.

ERICKSTAD, C.J., and LEVINE, GIERKE and VANDE WALLE, JJ., concur.

---

**8.** We do not regard § 47–02–31 N.D.C.C. as a barrier to this analysis. By the time of decision, it was clear that the contingency had not postponed vesting of the top lease in possession and that an imagined problem did not exist.