**IMPERIAL OIL OF NORTH DAKOTA, INC. and Target Energies, Inc., Appellants,**

v.

**INDUSTRIAL COMMISSION OF The STATE of North Dakota In the Matter of a Hearing Called On a Motion of the Commission to Consider the Application of Flying J Exploration and Production, Inc. for an Order Resolving a Dispute as to the Reasonable Actual Cost of Drilling and Operating the # 4–35 Skjelvik Well, located in the N/2 of Section 35, Township 150 North, Range 97 West, McKenzie County, North Dakota, as Provided in Order No. 2818, Appellee,**

and

**Flying J Exploration & Production, Inc., Intervenor & Appellee.**

Civ. No. 11222.

Supreme Court of North Dakota.

May 28, 1987.

Rolfstad, Winkjer, McKennett & Stenehjem, Williston, for Imperial Oil of North Dakota, Inc.; argued by Dean Winkjer.

Marvin L. Kaiser, Williston, for Target Energies, Inc.

Lawrence Bender, Asst. Atty. Gen., Industrial Com'n of North Dakota, Bismarck, for Industrial Com'n of the State of N.D.

Fleck, Mather, Strutz & Mayer, Bismarck, for Flying J Exploration & Production, Inc.; argued by John Morrison.

ERICKSTAD, Chief Justice.

Imperial Oil of North Dakota, Inc. (Imperial), and Target Energies, Inc. (Target), appealed from a district court judgment affirming an Industrial Commission (Commission) order determining that interest is a reasonable actual cost of drilling and operating a well and that Flying J Exploration and Production, Inc. (Flying J), was entitled to recover interest from Imperial and Target at an annual rate of 12.72 percent on their proportionate shares of the cost of drilling and operating the Skjelvik # 4–35 well. We reverse and remand.

In September 1981, the Skjelvik # 4–35 well was completed as a Red River produc-er. On November 17, 1981, the Commission entered an order setting temporary spacing for the development of the North Fork-Red River Pool at one well to 320 acres. Imperial and Target did not agree with Flying J, the operator of the well and spacing unit, to share in the cost of drilling and operating the well.

On July 1, 1982, the Commission entered an order pooling all interests for the development and operation of the spacing unit for the Skjelvik # 4–35. In resolving a dispute as to whether or not interest is an actual cost of drilling and operating the Skjelvik # 4–35 well, the Commission entered an order on May 17, 1985, in which it found:

> "(10) That the applicant [Flying J] presented evidence that from May 1, 1981, to October 10, 1984, during the time period of the drilling, completing and pay-out of the Skjelvik # 4–35 well, the applicant had an average outstanding debt obligation of $2,228,718, incurring an average interest expense of $283,478, yielding a weighted average annual interest rate of 12.72 percent."

The Commission also found:

> "(g) that in the drilling and operating of an oil and gas well, the cost of money is not considered an unnecessary expense.
> "(h) that the charge of interest on an unpaid debt is a reasonable actual cost in the drilling and operating of a well.
> "(i) that the inclusion of a charge of interest on the unpaid balance of a working interest's share of the cost of a well in addition to the cost of drilling and operating such well is just and reasonable.
> "(j) that the applicant submitted substantial credible evidence indicating that in drilling and operating the Skjelvik # 4–35 well, interest was an actual cost."

The Commission ordered that Flying J was entitled to reimbursement of interest from Imperial and Target at an annual rate of 12.72 percent on their proportionate shares

of the cost of drilling and operating the well.

Imperial and Target appealed to the district court, which affirmed the Commission's order. Imperial and Target appealed from the district court judgment and have raised issues relating to (1) failure of Commission members to hear the evidence and to specify the evidence relied upon; (2) retroactivity of pooling orders; (3) whether or not interest is an actual cost of drilling and whether or not there was evidence that Flying J was charged or paid any interest; and (4) a remand for consideration of new evidence.

In our view, the dispositive issue is whether or not § 38-08-08, N.D.C.C., allows the operator of a well to recover interest from nonconsenting owners as part of the reasonable actual cost of drilling and operating a well. We conclude that it does not.

The standard of review applicable to the Commission's order is stated in § 38-08-14(4), N.D.C.C.:

"Orders of the commission shall be sustained if the commission has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence."

Whether or not the Commission has the authority to order a nonconsenting owner to pay interest to the operator of a well under § 38-08-08, N.D.C.C., is a question of law. "Administrative agency decisions on questions of law are fully reviewable on appeal." *Slawson v. North Dakota Industrial Commission*, 339 N.W.2d 772, 774 (N.D.1983).

Section 38-08-08, N.D.C.C., provides in relevant part:

"1. ... In the absence of voluntary pooling, the commission upon the application of any interested person shall enter an order pooling all interests in the spacing unit for the development and operations thereof. Each such pooling order shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive, without unnecessary expense, his just and equitable share....

"2. Each such pooling order shall make provision for the drilling and operation of a well on the spacing unit, and for the payment of the reasonable actual cost thereof by the owners of interests in the spacing unit, plus a reasonable charge for supervision. In the event of any dispute as to such costs the commission shall determine the proper costs. If one or more owners shall drill and operate, or pay the expenses of drilling and operating the well for the benefit of others, then, the owner or owners so drilling or operating shall, ..., have a lien on the share of production from the spacing unit accruing to the interest of each of the other owners for the payment of his proportionate share of such expenses...."

Neither the Commission nor Flying J has asserted a longstanding Commission practice of awarding interest as a cost in contested proceedings. The Commission relies upon *Wood Oil Co. v. Corporation Commission*, 268 P.2d 878 (Okla.1954) for the proposition that the operator of a well may recover interest from nonconsenting owners as part of the reasonable actual cost of drilling and operating a well. The Commission argues that the court in *Wood Oil Co.* "correctly held that interest on the operator's own funds should not be charged since there was no evidence that interest was paid or that the incurring of interest was necessary to obtain production." The Commission also argues that the court in *Wood Oil Co.* "recognized that if the operator had been required to pay interest to develop the well and presented evidence of this cost, as in the present case, such costs could be recovered from the carried interest owners." We disagree. The court in *Wood Oil Co.* decided only that an operator who did not show that it was charged or paid any interest or that such expense was

necessary to obtain production could not recover interest from a carried owner:

"Wood Oil next complains that the Commission's order herein appealed from did not allow it interest on the operating cost of the well in determining the amount that should be paid by Toklan as its proportionate share of such cost. No authority is cited in support of such claim for interest, ... In addition, Toklan points out that the Conservation Law has never authorized an interest charge, unless such charge is conceivably included or contemplated in the term 'cost of the development and operation' as used in the 1945 and 1947 Amendments, supra, and that the meaning of said term is therein restricted to 'the actual expenditures required * * *'. We think Toklan's argument is sound. There was no evidence introduced before the Commission to show that Wood Oil was charged or paid any interest on the funds it used in operating this well or that such expense was in any way necessary to obtaining the production now impounded in the hands of the crude oil purchaser. In view of these considerations we must therefore conclude that the Commission committed no error in refusing, by its order, to add such a charge to the well's actual operating cost for the purpose of the adjustment of obligations between the parties contemplated in said order."
*Wood Oil Co. v. Corporation Commission, supra,* 268 P.2d at 885.

The court in *Wood Oil Co.* did not decide the broader issue of whether or not an operator could ever recover interest from a carried owner.

In our view, § 38–08–08, N.D.C.C., does not authorize the Commission to order a nonconsenting owner to reimburse the operator of a well for interest on the nonconsenting owner's proportionate share of the cost of drilling and operating a well. An interest charge is in the nature of a "risk capital charge" [O. Anderson, *Compulsory Pooling In North Dakota: Should Production Income And Expenses Be Divided From Date Of Pooling, Spacing, Or "First Runs?",* 58 N.D.L.Rev. 537, 567 (1982)], a "nonconsent penalty" [6 H. Williams and C. Meyers, *Oil and Gas Law* § 944, p. 673 (1986)], or a "risk penalty" [H.B. 1655, 49th Legislative Assembly (1985) (failed to pass)], which the legislature has not authorized.[1] Absent a statute to the contrary, we believe that interest expense incurred by an operator in the drilling and operation of a well, like extraordinary royalty interests, is "an additional hazard to the drilling party's payout" [5 Summers Oil and Gas § 974, p. 123 (1966 Ed.)] in situations where a nonconsenting owner has had his "interests in the spacing unit" pooled against his will under § 38–08–08, N.D.C.C. We therefore reverse the judgment from which Imperial and Target have appealed.

It might be argued that our decision will encourage some working interest owners to refrain from voluntarily pooling their interests for the development and operation of a spacing unit because they will otherwise be able to get a "free ride" on their proportionate share of drilling costs to the extent of interest expense incurred by the operator. We do not believe, however, that our decision will have a significant impact on working interest owners faced with deciding whether or not to voluntarily pool their interests. Owners who voluntarily pool their interests and join in a drilling venture will be able to control the costs of drilling and operating a well by contracting in regard to costs. The opportunity to negotiate drilling costs in advance by participating in a drilling venture is an incentive to participate, even though no interest will be charged an owner who does not participate in the drilling venture. Owners whose interests are force-pooled by order of the Commission will, in the event of a dispute as to costs, have the costs determined by the Commission. We believe that

---

1. We note that S.B. 2346 [50th Legislative Assembly (1987)] also failed to pass. That bill proposed comprehensive changes in § 38–08–08, N.D.C.C., by requiring that a nonconsenting owner be required to pay 100% of his share of the cost of certain surface equipment; plus 100% of his share of the cost of operation of the well; plus 200% of his share of the expenses of various well site preparation, drilling, and completion activities.

in most cases owners will prefer to determine costs by contract rather than have them determined by the Commission.

Our conclusion that § 38–08–08, N.D. C.C., does not authorize the Commission to order a nonconsenting owner to reimburse the operator of a well for interest on the nonconsenting owner's proportionate share of the cost of drilling and operating a well renders unnecessary any determination of the other issues raised by Imperial and Target.

For the reasons stated, the judgment is reversed and the matter is remanded to the district court with instructions to remand to the Commission for disposition in accordance with this opinion.

VANDE WALLE and LEVINE, JJ., and PEDERSON,* Surrogate Justice, concur.

MESCHKE, Justice, dissenting.

Interest on debt for drilling and operating an oil well can be a "reasonable actual cost" for the Industrial Commission to allocate to fractional operating interests which are involuntarily pooled under N.D.C.C. § 38–08–08. Therefore, I respectfully dissent.

In regulating oil and gas development, the North Dakota Industrial Commission must pool "all interests in the spacing unit for the development and operations [of a well] ... [i]n the absence of voluntary pooling, ..." N.D.C.C. § 38–08–08. The order "shall be upon terms and conditions that are just and reasonable," affording each interest owner "the opportunity to recover ... without unnecessary expense, his just and equitable share." *Id.* The Commission must provide "for the payment of the reasonable actual cost" of the drilling and operation of the well, "plus a reasonable charge for supervision." *Id.* In the vocabulary of the oil business, an involuntarily pooled interest in North Dakota is a "carried interest," since the well operator has only "a lien on the share of production ... accruing to the interest of each of the other owners for the payment of his proportionate share of such expenses." *Id.*[1]

Thus, in North Dakota, an operator who drills a well without complete voluntary pooling has recourse only to a nonparticipants' share of production from that well, and no other way to obtain contribution to its costs. To begin with, then, there is little or no incentive for a fractional operating interest to voluntarily pool because that person has nothing to gain over involuntary pooling. Consider *Superior Oil Co. v. Humble Oil & Refining Company*, 165 So.2d 905 (La.Ct.App.1964).

There is no reason to confine the meaning of the statutory phrase "reasonable actual cost." There is ample reason to recognize a practical and reasonable interpretation where the phrase is coupled with instructions to the regulatory agency to set "just and reasonable" terms and to afford each owner "his just and equitable share." We should give great weight to a reasonable construction of a regulatory statute adopted by the administrative agency charged with enforcement of the statute. "This court, ... has indicated its reluctance to substitute its own judgment for that of qualified experts in matters entrusted to administrative agencies:" *Amoco Production Co. v. North Dakota Ind. Comm.*, 307 N.W.2d 839, 842 (N.D.1981). "Where the subject matter is of a technical nature, the

---

* PEDERSEN, S.J., sitting in place of GIERKE, J., disqualified.

1. "A fractional interest in oil and gas property, usually a lease, the holder of which has no personal obligation for operating costs, which are to be paid by the owner or owners of the remaining fraction, who reimburse themselves therefor out of production, if any. The person advancing the costs is the carrying party and the other is the carried party....

"The details of a carrying agreement vary considerably, *e.g.*, whether the operator (the party who is putting up the cost of development) has control of the oil and the right to sell it or the carried party can sell his part of the oil; whether the carried interest is to be carried for the initial development purchase only of the operation or for the life of the lease; whether interest is to be charged and, if so, the rate; who would own the equipment, such as pipe, motors and pumps, if and when production ceased; ..." *Oil and Gas Terms*, Williams and Meyers, Matthew Bender (New York 1984).

expertise of the administrative agency is entitled to respect;" *Triangle Oilfield Services, Inc. v. Hagen,* 373 N.W.2d 413, 415 (N.D.1985). While an administrative decision on a question of law is fully reviewable on appeal, *Slawson v. North Dakota Industrial Commission,* 339 N.W.2d 772, 774 (N.D.1983), each ingredient of "reasonable actual cost" ought to be a matter of fact for determination by the Industrial Commission.

Nothing in our precedents is antagonistic to treating interest on debt as a cost of commercial activities. To the contrary, we have often recognized interest on related debt as a proper cost in computing damages in contract matters. *Berg v. Hogan,* 322 N.W.2d 448 (N.D.1982); *Hall GMC, Inc. v. Crane Carrier Co.,* 332 N.W.2d 54 (N.D.1983). We should also do so in this commercial field. *See Nantt v. Puckett Energy Co.,* 382 N.W.2d 655, 660 (N.D. 1986).

We do agree with Chief Justice Erickstad that *Wood Oil Co. v. Corporation Commission,* 268 P.2d 878 (Okla.1954) did not decide whether an operator could ever recover interest from a carried owner under Oklahoma's forced pooling statutes. *Wood Oil* did not allow the recovery of interest, where there was no evidence about interest paid, but this case is different.

Here, there was evidence that Flying J had interest expense on debt for the drilling and operating of the Skjelvik # 4-35 well. The comptroller for Flying J testified as an expert on petroleum accounting and computed annual borrowing costs of Flying J. He submitted an exhibit showing the "actual effective annual borrowing costs" of Flying J for 1981 through 1984, explained that it represented the "actual out-of-pocket costs of money" to Flying J, and concluded that its average borrowing cost was 12.72%. The only detracting evidence was that Flying J paid the interest to its parent company, rather than an outside creditor.

From this evidence, the Commission determined that "the charge of interest on an unpaid debt is a reasonable actual cost in the drilling and operating of a well," that the inclusion of interest "on the unpaid balance of a working interest's share of the cost of a well ... is just and reasonable," and that Flying J "submitted substantial credible evidence indicating that in drilling and operating the Skjelvik # 4-35 well, interest was an actual cost."

Scholarly discussion about interest, as an allocable cost in regulatory forced pooling, is skimpy. The opinion of the Chief Justice suggests that legal scholars look at interest not as a cost factor but rather as a "risk capital charge" [O. Anderson, *Compulsory Pooling In North Dakota: Should Production Income and Expenses Be Divided From Date of Pooling, Spacing, or "First Runs?",* 58 N.D.L.Rev. 537, 567 (1982) ] or as a "nonconsent penalty" [6 H. Williams and C. Meyers, *Oil and Gas Law* § 944, p. 673 (1986). I disagree with these characterizations of the observations of those scholars.

Anderson's article addresses a different issue (although it is also one that was argued on this appeal), whether forced pooling should be retroactive to the date of first production, and analyzes decisions (including *Wood Oil, supra*), making pooling orders non-retroactive. He points up the unfairness of non-retroactivity, "unless one justifies the ruling as a penalty for the failure of the nonparticipating working interest owners to participate upfront in the drilling venture." 58 N.D.L.Rev. at 563. He urges that pooling be treated as "retroactive to the date of first production" as the simplest solution to assure just and equitable sharing of production. Anderson goes on to say:

> "If a penalty for failing to participate upfront in the drilling venture is deemed suitable, a penalty could be superimposed over this initial allocation. For example, the nonparticipating working interest owner could be assessed a risk capital charge over and above the actual drilling and completion expenses. The amount of the charge could be based on the state's producer/dry-hole ratio for 'wildcat' or 'development' wells, or it could simply be the prime rate of interest plus a specified percent." *Id.* at 567.

This statement contemplates something very substantial, "over and above the actual ... expenses," without excluding interest on related debt from those "actual expenses."

Similarly, the reference to a "nonconsent penalty" in 6 H. Williams and C. Meyers, *Oil and Gas Law* § 944, p. 673 (1986), should be considered in its context. It occurs in a section about "options afforded owners of operating interests." The authors report that Oklahoma courts have approved "nonconsent penalties" of 50 to 100% of the carried participants share of the cost, in addition to actual costs, and that many voluntary pooling agreements as well as some compulsory pooling statutes provide for such substantial non-consent penalties. *See, for example, Holmes v. Corporation Commission*, 466 P.2d 630 (Okla.1970) sustaining an order imposing a 250% non-consent penalty. Williams and Meyers do not focus on interest on debt as an ingredient of actual costs.

One law review article, Swan and Hallock, *The Comparisons, Contrasts, and Effects of Compulsory Pooling Statutes*, 28 Rocky Mountain Mineral Law Institute 911 (1983), does identify interest on related debt as an item of actual cost, while describing the commercial context of forced pooling. This article points out that "the issue most important to the 'owners' who have the right to drill is how the burdens and risks of development will be divided among them. Often it is the only real issue." *Id.* at 935.

Swan and Hallock observe that "a wide variety of treatment is given to the owner who chooses not to participate." *Id.* at 937. They summarize:

"Some statutes provide that his share will be paid out of production. Alternatively, other statutes say that he can participate on a limited or carried basis. Some states charge a non-participant with a 'non-consent' penalty. Many which do not, could. All states should. Such penalties are routine in voluntary agreements."

A number of states are identified as authorizing or imposing non-consent penalties ranging from 100% to 200%, over and above actual costs:

"These penalties, at first glance, seem to unduly penalize a non-participant who didn't want to drill a well in the first place. They are, however, less severe than the penalties knowledgeable operators agreed to voluntarily for similar ventures. Without a non-consent penalty, no compulsory pooling order would be 'just and reasonable' in the sense of including terms which reasonable men would insist upon and agree to in a voluntary agreement entered into for the same purpose. This is true whether the statute specifically allows or requires such a penalty, or merely requires just, fair, equitable, or reasonable terms." *Id.* at 941.

These authors conclude:

"The terms of a compulsory pooling should therefore be as close as possible to those which reasonable and well-informed parties would agree to for themselves under the same facts and circumstances." *Id.* at 945.

Specifically, in commenting on *Wood Oil, supra,* Swan and Hallock discuss interest as a cost factor:

"It seems, however, that the designated operator should be entitled to recover interest on money spent by him for the benefit of all in accordance with a pooling order. If he had not had to borrow the money on his own credit both for his share and the nonparticipant's share, he could have invested what he put up for his uncooperative partner. *The failure to allow reasonable interest in these days gives a non-consenting owner an undeserved 'free ride.'*" *Id.* at 936. (emphasis added.)

I believe Swan and Hallock write convincingly and sensibly on the subject. *See also, Application of Kohlman*, 263 N.W.2d 674 (S.D.1978) which approved a 100% risk compensation in addition to actual costs as "reasonable under the circumstances," holding that authority to set risk compensation is necessarily implied and reasonably necessary to effectuate the

power and duty of the regulatory board in South Dakota to impose compulsory pooling.

When viewed in the larger context of "nonconsent penalties" and "risk capital charges" ranging up to 300% in addition to sharing actual costs, annual interest of 12.72% as an actual cost charged to the fractional operating ownerships of Imperial and Target is surely reasonable. To me, it is a "reasonable actual cost" which the Commission can allocate.

Therefore, I would affirm the decision of the Industrial Commission on this issue.