Alex MARAGOS, Edwin Feland
and Estate of Mildred Feland,
Plaintiffs and Appellants,

v.

NORWEST BANK MINNESOTA, N.A.,
Flore Properties, Inc., Defendants
and Appellees,

Union Oil Company of California, Phillip
Armstrong as Trustee of the Chapter 7
Bankruptcy Estate of Kye Trout, Jr.,
Case No. 87–05075, and all other persons
unknown claiming any estate or interest
in, or lien or encumbrance upon, the
property described in the Complaint, Defendants.

Civ. No. 930037.

Supreme Court of North Dakota.

Oct. 29, 1993.

John C. Skowronek, of Lamont, Skowronek & Dobrovolny, Minot, and Owen L. Anderson, Norman, OK, for plaintiffs and appellants.

Lawrence R. Klemin, of Bucklin & Klemin, P.C., Bismarck, and Diane B. Davies, of Faegre & Benson, Denver, CO, for defendants and appellees.

Gary R. Wolberg, of Fleck, Mather & Strutz, Bismarck, for defendant Union Oil Co. of California.

SANDSTROM, Justice.

Edwin Feland and the Estate of Mildred Feland[1] (collectively, Feland), and Alex Maragos have appealed from a district court judgment dismissing their claims against Norwest Bank Minnesota, N.A. (Norwest), Flore Properties, Inc. (Flore), Union Oil Company of California (Unocal), Phillip Armstrong as Trustee of the Chapter 7 Bankruptcy Estate of Kye Trout, Jr. The judgment also declared an oil and gas lease dated July 12, 1976, to be in full force and effect; quieted title to the lease in Norwest and Flore insofar as it covers the W½ of Section 30, Township 163 North, Range 82 West; and awarded Norwest and Flore damages for

---

1. Mrs. Feland died while the case was pending in district court and her estate was substituted as a plaintiff.

breach of warranty, costs, disbursements and attorney fees in the sum of $187,755.28. We reverse and remand for a new trial.

On December 12, 1960, Feland granted an oil and gas lease to T.S. & T., Inc., covering the E½W½ and Lots 1, 2, 3, and 4 of Section 30, Township 163 North, Range 82 West. Feland warranted and agreed to defend the title to the described lands. The lease was subject to a letter agreement providing:

"(a) If the first well is timely commenced and drilled, then the entire lease shall remain in full force and effect for a period of one year from date of lease, whether or not the well is a producer or a dry hole. In event of production, then said lease shall remain in full force and effect as to the quarter section of land upon which the well is located for as long as there is production.

"(b) Additional wells are required to be drilled at the rate of at least one per year, one on each quarter section of land. Each successive well will hold the entire acreage under lease for an additional one year period, whether producer or dry hole. If at any time the successive wells are not timely drilled by Lessee, then all the acreage in the quarter section not so drilled is to be released from the lease."

T.S. & T., Inc., assigned its interest in the lease to Simcox Oil Company, which drilled a producing oil well, the Edwin Feland #1, in the NW¼NW¼ of Section 30 in 1961. No other well was ever drilled in the W½ of Section 30. In 1962, Simcox released the SW¼ of Section 30. In 1966, Simcox assigned its interest under the T.S. & T. lease as to the NW¼ of Section 30 to Unocal, which produced the Edwin Feland #1 until 1985.

On July 12, 1976, Feland granted to Trout an oil and gas lease covering "Section 25: NE¼, S½" and "Section 30: Lots 1 (37.53 [acres]), 2 (37.55), 3 (37.57), 4 (37.59), E½W½", containing 790.24 acres. This lease was recorded on October 25, 1982. Also on July 12, 1976, Feland granted to Trout an oil and gas lease covering "Section 25: All" and

"Section 30: Lots 1 (37.53), 2 (37.55), 3 (37.-57), 4 (37.59), E½W½", containing 950.24 acres. This lease was recorded on June 24, 1985. Trout completed a well in the NW¼ SW¼ of Section 25 in 1976. Production continued on Section 25 under the 1976 leases until the date of trial.

In 1983, Norwest loaned money to Trout and took mortgages on his leaseholds. By early 1984, the Edwin Feland #1 was only marginally productive and Feland wanted additional wells drilled in the W½ of Section 30. Feland engaged Maragos as an agent to attempt to get another well drilled on the W½ of Section 30. Maragos believed that no other wells could be drilled under the T.S. & T. lease because of the continuous drilling provision in the 1960 letter agreement, and offered Unocal a new lease on the W½ of Section 30. Unocal contended that the entire W½ of Section 30 was held by production from the Edwin Feland #1, and requested Feland to execute an amendment to the T.S. & T. lease, which Feland declined to do.

In early 1985, Feland served upon Trout a notice of termination of one[2] of the 1976 leases under § 47–16–36, N.D.C.C., without notice to Norwest. Unocal assigned all its interest in the 1960 T.S. & T. lease to Trout on December 11, 1985. Shortly thereafter, Trout and Maragos began negotiations to amend the T.S. & T. lease or execute replacement leases. On April 28, 1986, Feland granted Trout two new leases, one covering "Section 30: Lot 1 (37.53), 2 (37.55), E½NW¼" and the other covering "Section 30: Lot 3 (37.57), 4 (37.59), E½SW¼." In conjunction with the granting of those two leases, on April 29, 1986, Feland and Trout executed a letter of agreement requiring Feland (lessor) to give a five-year lease on Section 30; requiring Trout (lessee) to cease operations on the premises for sixty days; requiring Trout to redrill by October 1, 1986; requiring Trout to give a draft for $11,400; requiring Trout to release all present leases on the premises; and requiring Trout to give a 4% net overriding royalty to Maragos. Trout recorded the 1986 leases and stopped

---

**2.** Feland contended in his brief: "There were two 1976 Trout leases: The first 1976 Trout lease (which was recorded second) was invalid be-

cause the second corrected 1976 Trout lease (the first recorded) acted as a novation of the first 1976 Trout lease."

production of the Edwin Feland # 1 well. Trout did not drill a new well or execute releases of the other leases of record.

On June 30, 1986, Norwest and Trout modified the repayment terms on Trout's 1983 loan and executed a mortgage modification agreement, which included the 1986 Trout leases as additional security. Trout filed a bankruptcy petition on January 23, 1987. In early 1988, Trout assigned the leases to Norwest so that, in the event of default on his loan, Norwest could take possession of his leases, in lieu of foreclosure. When Trout breached the agreement, Norwest recorded the assignment of the 1976 leases, but not the 1986 leases.

Maragos informed Norwest that the 1986 Trout leases were invalid because Trout failed to drill a new well by October 1, 1986, in accordance with the 1986 letter agreement. On November 22, 1988, Feland granted Maragos a lease covering all of the W½ of Section 30. Maragos thereafter offered to assign that lease to Norwest, with Maragos to retain a 5 percent overriding royalty interest, Norwest to pay a bonus of $25.00 per acre, and Norwest to drill a well by July 1, 1989.

Norwest assigned its interest in the two 1976 Trout leases to Flore, and they began attempting a sale of those and other leases to Unocal. Unocal unsuccessfully sought Feland's ratification of the 1986 Trout leases, although Feland ratified a 1976 Trout lease covering the NE¼ and the S½ of Section 25. On December 26, 1989, Norwest and Flore sold their interests in the 1976 Trout leases to Unocal. On February 19, 1990, Unocal assigned back to Norwest and Flore its interest in the second 1976 Trout lease as to the W½ of Section 30.

Maragos and Feland brought this action to quiet title in the W½ of Section 30 against Norwest, Flore, Unocal, and Armstrong as trustee of Trout's bankruptcy estate. The complaint also sought money damages. Norwest and Flore answered and counterclaimed. Unocal disclaimed any interest in the W½ of Section 30. Neither Armstrong, as trustee of Trout's bankruptcy estate, nor Trout appeared in the action.

The trial court found, among other things: (1) The 1976 leases contain language warranting and agreeing to defend title to the described lands. (2) In October 1976, Trout completed a well in Section 25 under the 1976 leases. (3) In 1985, Feland attempted to terminate the first 1976 Trout lease under § 47–16–36, N.D.C.C., by serving notice on Trout, but not Norwest. (4) In April 1986, Feland gave Trout two new leases on Section 30. (5) On October 1, 1988, Trout assigned the 1976 leases to Norwest. (6) Production has continued on Section 25 under the 1976 Trout leases to the date of trial. (7) The letter of agreement accompanying the 1986 Trout leases "was unsupported by any new or additional consideration" [finding of fact No. 26]. (8) Unocal, Norwest, and Flore agreed to a price of $135,142 for the W½ of Section 30 if Norwest could obtain ratifications of the Trout leases from the plaintiffs. (9) The current value of the W½ of Section 30 is $10,000 if title is cleared. (10) Norwest has spent $61,600 in defending this action and in attempting to quiet title. (11) When Trout leased in 1976 the W½ of Section 30 was held by production on the SW¼ of Section 25 under the T.S. & T. lease. (12) When the T.S. & T. lease was released, "that production on the SW¼ of 25 then held the 1976 leases as to the W½ of 30, too."

The trial court concluded: (1) Feland warranted title to the W½ of Section 30 in the 1976 leases. (2) "When the T.S. & T. lease was released in 1986, the 1976 Trout leases then applied to the W½ of 30." (3) "Production on Section 25 under the 1976 Trout leases holds all the premises covered by those leases, including the W½ of 30." (4) Feland's attempt to terminate the first 1976 Trout lease under § 47–16–36, N.D.C.C., was ineffective as to Norwest because of failure to notify Norwest. And (5) "Norwest and Flore are entitled to judgment quieting title in them to the minerals in the W½ of 30 covered by the 1976 leases, and to judgment against the plaintiffs for ... damages of $125,142 for breach of warranty ... and $61,600 expended defending plaintiffs' attack" on their title.

Judgment was entered accordingly and Feland and Maragos appealed, contending

the 1986 Trout leases superseded all prior leases insofar as they applied to the W½ of Section 30; Norwest is not a bona fide purchaser of a mortgage, a modified mortgage, or of lease assignments; Norwest was not entitled to notice as a successor or assign under § 47–16–36, N.D.C.C.; and Norwest was not entitled to an award of damages for breach of warranty.

"A conclusion of law is fully reviewable on appeal but a finding of fact is not set aside unless clearly erroneous. Rule 52(a), N.D.R.Civ.P." *National Bank of Harvey v. International Harvester Co.*, 421 N.W.2d 799, 803 (N.D.1988). "Whether a determination is a finding of fact or a conclusion of law is decided by the reviewing court, and labels applied by the trial court are not conclusive." *Guardianship of Braaten*, 502 N.W.2d 512, 517 (N.D.1993).

■ In what it labeled as finding of fact number 26, the trial court found the 1986 letter of agreement executed in conjunction with Feland's issuance of the 1986 leases to Trout "was unsupported by any new or additional consideration." The existence of consideration is a question of law. *Estate of Jorstad*, 447 N.W.2d 283 (N.D.1989). Thus, the trial court's finding of no consideration is actually a conclusion of law, fully reviewable on appeal. From our review of the record, we conclude the trial court's conclusion that the 1986 letter of agreement executed in conjunction with Feland's issuance of the 1986 leases to Trout is not supported by any of the court's findings of fact and, in light of the evidence in this record, is incorrect.

■ Under N.D.C.C. § 9–05–10, a written instrument is presumptive evidence that there was consideration for it. *Farmers Union Oil Co. v. Maixner*, 376 N.W.2d 43 (N.D. 1985). "Refraining from doing something which one has a legal right to do constitutes good consideration." *Farmers Union* at 46. "[F]orbearance from bringing suit can constitute good consideration." *Farmers Union* at 46. "Good consideration to support a contract may consist in a benefit to the promisor or a detriment to the promisee." *First Nat'l Bank & Trust Co. v. Brakken*, 468 N.W.2d 633, 638 (N.D.1991).

"Consideration may be defined as any benefit conferred or detriment suffered. *Gulden v. Sloan*, 311 N.W.2d 568, 572 (N.D. 1981); NDCC § 9–05–01. Detriment, as used in a contractual context, means legal detriment as distinguished from detriment in fact. It means giving up something which the promisee was privileged to retain, or doing or refraining from doing something which he was privileged not to do, or not to refrain from doing. *Gulden, supra.*"

*Harrington v. Harrington*, 365 N.W.2d 552, 555 (N.D.1985). "Under § 9–05–01, N.D.C.C., any benefit conferred upon a promisor or prejudice suffered or agreed to be suffered by a promisee is a good consideration for a promise." *First Nat'l Bank & Trust Co. v. Jacobsen*, 431 N.W.2d 284, 288 (N.D.1988). One's relinquishment of a legal right is consideration for an agreement regardless of the value of that right to the other party to the agreement. *Harrington.* This court long ago held where a vendee's surrender of a land contract is accepted by the vendor, the release of the vendor from the obligations of the contract is a sufficient consideration to support the surrender. *Kvello v. Taylor*, 5 N.D. 76, 63 N.W. 889 (1895).

■ The 1986 letter of agreement between Feland and Trout, executed in conjunction with Feland's issuance to Trout of new leases in 1986, was supported by consideration. *See Nantt v. Puckett Energy Co.*, 382 N.W.2d 655, 658 (N.D.1986) ("instruments relating to the same transaction and executed at the same time to be read and construed together"). The parties mutually acquired benefits and suffered legal detriment. Between the parties, there were longstanding questions about title to the W½ of Section 30. Each party gave up the right to litigate a resolution of their title dispute. The issuance of the 1986 leases gave Feland a promised release of all prior leases, the continued validity of which he had been challenging, an $11,400 bonus, and a promise that a long-sought additional well would be drilled by October 1, 1986. The issuance of the 1986 leases gave Trout, with the release of all prior leases, a clear right to drill in the W½ of Section 30, which had been in dispute for

several years, without the expense or risk of litigation. The mutual benefits acquired and detriment borne by the parties constituted consideration for the promises in their April 29, 1986, letter of agreement under this court's decisions in such cases as *Harrington* and *Kvello*. Feland's granting of the 1986 leases and Trout's acceptance of those leases was consideration for Trout's promises in the 1986 letter of agreement to release all prior leases, pay a bonus, and drill an additional well. Our conclusion that there was consideration for the parties' 1986 letter of agreement requires that we reverse the judgment.

The other issues raised in this appeal need not be addressed. *See Hospital Services, Inc. v. Brooks*, 229 N.W.2d 69, 71 (N.D.1975): "Questions, the answers to which are not necessary to the determination of a case, need not be considered."

The judgment is reversed and the matter is remanded for a new trial.

VANDE WALLE, C.J., LEVINE and MESCHKE, JJ., and DONALD L. JORGENSEN, District Judge, concur.

DONALD L. JORGENSEN, District Judge, sitting in place of NEUMANN, J., disqualified.