**Application of Paul KOHLMAN from the Board of Natural Resource Development.**

**No. 12082.**

Supreme Court of South Dakota.

March 20, 1978.

Donn Bennett of Mueller & Bennett, Belle Fourche, for appellants Depco, Inc. and Hanover Planning Co., Inc.

E. D. Mayer of Riter, Mayer, Hofer & Riter, Pierre, for respondent Paul Kohlman.

William J. Janklow, Atty. Gen., Pierre, for respondent Bd. of Natural Resource Development.

ZASTROW, Justice.

This is an appeal from the judgment of the circuit court modifying the compulsory pooling order of the Board of Natural Resource Development.

On August 13, 1973, the Board of Natural Resource Development for the State of South Dakota (Board) entered an order establishing an oil and gas spacing unit known as Buffalo Field. This field is comprised of the land area described as Section 19, Township 23 North, Range 5 East of the Black Hills Meridian, Harding County, South Dakota. This spacing unit is a short section bordering on the North Dakota-South Dakota line and contains slightly in excess of 400 acres. This spacing unit was created at the request of one of the owners of oil rights in that area, namely, Depco, Inc., the appellant herein. The owners of natural resource rights in this land area are Paul Kohlman, respondent, who holds the oil and gas lease on a 40-acre tract located in the extreme southeast corner of the spacing unit, and Depco, Inc., and its partner, Hanover Planning Co., Inc. (hereinafter collectively referred to as Depco), who control the oil and gas leases on the balance of 371.68 acres in the spacing unit. Establishing this area as a spacing unit necessarily limited the number of wells in that unit to one. Kohlman made no objection to the spacing unit order of August 1973, entered by the Board.

Following the establishment of the spacing unit, Depco indicated a desire to drill a well therein, and for maximum recovery potential desired to place the drill site on the 40-acre tract leased by Kohlman. The parties attempted to negotiate a voluntary arrangement regarding the payment of drilling expenses, the sharing of the proceeds, and all other requirements necessary between the owners of the land in the spacing unit, pursuant to SDCL 45–9–30. All attempts to a voluntary agreement failed; thereafter, Depco applied under SDCL 45–9–31 to the Board for a compulsory pooling order.

Pursuant to that application, notice of hearing was given and a hearing was held on April 11, 1974. Oral testimony was given by Depco's officers and Kohlman; following the hearing, written briefs were submitted by both parties. On May 29, 1974, the Board entered its Pooling Order No. 1–74, the order in dispute in this appeal. The order gave Kohlman the option of prepaying Depco a proportionate share of the estimated costs of drilling the well, or:

"b) That the operator (Depco) is hereby authorized to withhold the following costs and charges from production: The pro rata share of reasonable well costs attributable to each nonconsenting working interest owner who has not paid his share of estimated well costs within 30 days from the date the schedule of estimated well costs is furnished to him. As a charge for the risk involved in the drilling of the well, 100 percent of the prorata share of reasonable well costs attributable to each nonconsenting working interest owner who has not paid his share of estimated well costs within 30 days from the date the schedule of estimated well costs is furnished to him. Such charges shall be exclusive of a royalty of not more than ⅛ of production occurring to the royalty owner."

This type of provision is referred to in the oil and gas industry as a "compensation for risk," "risk compensation," "risk bonus," or "risk penalty." It is intended to relieve the nondrilling interest owner from having to advance his proportionate share of the drilling costs but provide extra compensation from production (if oil is found) to the drilling party who has advanced the entire drilling costs and who would absorb the entire cost of a "dry hole."

The trial court held that the Board has exceeded its statutory authority in providing for the risk compensation and ordered the pooling order modified to delete subdivision (b).

The issue in this appeal is whether or not the Board is authorized to provide for "risk compensation" in a compulsory pooling order under SDCL 45–9–33.

SDCL 45–9–32 sets the requirements of a compulsory pooling order as follows:

"Each such pooling order shall authorize the drilling, equipping, and operation of a well on the spacing unit; shall provide who may drill and operate the well; shall prescribe the time and manner in which all the owners in the spacing unit may elect to participate therein; and shall make provision for the payment by all those who elect to participate therein of the reasonable actual cost thereof, plus a reasonable charge for supervision and interest."

SDCL 45–9–33 provides that alternatives are to be given to those working interest owners who elect not to participate in the risk and cost of drilling prior to production. The alternatives are stated in SDCL 45–9–33 as follows:

"If requested each such pooling order shall provide for one or more just and equitable alternatives whereby an owner who does not elect to participate in the risk and cost of the drilling and operation of a well may elect to surrender his leasehold interest to the participating owners on some reasonable basis and for a reasonable consideration which if not agreed upon, shall be determined by the board, or may elect to participate in the drilling and operation of the well, on a *limited or carried basis upon terms and conditions determined by the board to be just and reasonable.*" (emphasis added)

The question of a nonparticipating, working interest owner sharing in the risk of drilling the well is discussed in 5 Summers, Oil and Gas, § 974:

"The majority of compulsory pooling statutes whereby royalty and working interest ownerships are force pooled on the basis of drilling and spacing unit areas require the drilling party, if other working interest owners do not elect to participate, simply to carry non-drilling interest owners at his risk. If successful in obtaining production, he then may recover proportionate actual outlays for drilling, completion costs and cumulative expenses prior to participation by the non-drilling parties. * * *

"To put it mildly this is an unattractive arrangement from the standpoint of the party taking the drilling risks. Not all states follow it. * * *

"What makes the shoe pinch in these situations of forced pooling for the drilling of a well is the case of a working interest owner who wishes to drill despite that the drilling and spacing unit is located at a considerable distance from established production because the primary term of his lease is running out. On the other hand, another working interest owner who will be subjected to the compulsory procedures may have a considerable period of time remaining in his lease and prefer to await drilling developments by others instead of participating in a hazardous stepout drilling venture." 5 Summers, Oil and Gas, § 974, pp. 122–124.

The Summers treatise lists New Mexico, Texas, Arkansas and Oklahoma as those statutes which do not allow the nonparticipating owners a "free ride." New Mexico,[1] and Texas,[2] have specific statutory provisions which set the maximum that their respective administrative agencies may impose as risk compensation in addition to the proportionate share of the well costs. Arkansas[3] provides that the Board may impose an "additional sum" with no limit nor any indication that the sum represents a risk compensation.

---

1. New Mexico Statutes Annot. 65–3–14(c).

2. See Vernon's Civil Statutes of Texas, Art. 6008c, Title 102; Texas Mineral Interest Pooling Act of 1965, Sec. 2(d).

3. Arkansas Comp. Laws Annot. 53–115 A–1(c).

Depco relies upon the judicial interpretation of the Oklahoma statute, which is similar to South Dakota's statute, as authority for the imposition of a risk penalty by the Board.

Oklahoma Statutes Annot. 52, § 87.1(d) provides:

"All (compulsory pooling) orders * * * shall be upon such terms and conditions as are just and reasonable and will afford to the owner of such tract in the unit the opportunity to recover or receive without unnecessary expense his just and fair share of the oil and gas. * * * Such pooling order of the Commission shall make definite provisions for the payment of cost of the development and operation, which shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, including a reasonable charge for supervision."

Depco cites *Holmes v. Corporation Commission*, 1970, Okl., 466 P.2d 630; *Anderson v. Corporation Commission*, 1957, Okl., 327 P.2d 699; *Wakefield v. State*, 1957, Okl., 306 P.2d 305; *Superior Oil Co. v. Oklahoma Corp. Commission*, 1952, 206 Okl. 213, 242 P.2d 454; and *Youngblood v. Seewald*, 1961, 10 Cir., 299 F.2d 680, as those cases which have recognized the authority of the Oklahoma Corporation Commission to impose risk compensation under O.S.A. 52, § 87.-1(d).

Only *Holmes* involved the imposition of a risk compensation in a compulsory pooling order by the commission. The protestant in that case did not challenge the authority of the commission to set risk compensation, but rather attacked the 250% risk compensation as excessive and thus an abuse of discretion by the commission. The amount of risk compensation was upheld by the Oklahoma Supreme Court.

The other cases involved corporation commission orders which gave the nondrilling owners the alternative of participating in the well costs or relinquishing their interests and receiving a cash bonus or overriding royalty interests. Although not specifically allowed by the statute, the compulsory pooling orders' relinquishment provisions were upheld by the Oklahoma Supreme Court under O.S.A. 52, § 87.1(d) provision for "terms and conditions as are just and reasonable." It would appear that SDCL 45–9–33 is much more specific in its directions to the Board in requiring it to set alternatives in compulsory pooling orders for the surrender of the leasehold or participation on a limited or carried basis when requested by the parties.

■ The purpose of SDCL, Ch. 45–9 is stated by the legislature as follows:

"It is hereby declared that it is in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state of South Dakota in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage, to authorize, and to provide for cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources." SDCL 45–9–1.

The Board is given the duty to perform all the necessary quasi-legislative and quasi-judicial functions necessary to carry out the state's purpose of SDCL, Ch. 45–9. SDCL 1–40–10. It is obvious that the legislature has recognized that resolving the details required in this legislative area of regulating oil and gas recovery is better left to a qualified administrative board made up of members with expertise in the field of natural resources.[4] See *Valley State Bank of*

---

4. See, Curlee, *The Problem of the "Free-Riding" Lessee*, Ninth Annual Institute on Mineral Law, 21; Morris, *Compulsory Pooling of Oil and Gas Interests in New Mexico*, 3 Natural

*Canton v. Farmers State Bank*, 87 S.D. 614, 213 N.W.2d 459.

 In addition to those powers expressly conferred upon an administrative agency, the agency has such implied powers as are necessarily implied and reasonably necessary to effectuate the express powers granted to, or duties imposed upon, it. *Utah Idaho Sugar Co. v. Temmey*, 68 S.D. 623, 5 N.W.2d 486; 73 C.J.S. Public Administrative Bodies and Procedure § 50; 58 C.J.S. Mines and Minerals § 229(3); 1 Am. Jur.2d, Administrative Law, § 72; 38 Am. Jur.2d, Gas and Oil, § 148; see also *Application of Live Stock State Bank, Artesian*, 1977, S.D., 252 N.W.2d 227. Where the legislature sufficiently prescribes a policy, standard, or rule for the guidance of the administrative body, authority may be delegated to the administrative body to carry out the legislative purposes in detail and to exercise the administrative power to regulate and control. *Boe v. Foss*, 76 S.D. 295, 77 N.W.2d 1; 1 Am.Jur.2d, Administrative Law, §§ 110–122; 73 C.J.S. Public Administrative Bodies and Procedure § 30. The fact that the determination of facts and the inferences to be drawn therefrom pursuant to statutory standards and policy declarations call for the exercise of discretion is not fatal to the delegation of the power to the administrative agency. *Boe v. Foss*, supra. 73 C.J.S. Public Administrative Bodies and Procedure § 31; 1 Am.Jur.2d, Administrative Law, § 125. This is particularly true where the exercise of discretion by the agency is protected from arbitrariness and abuse by the requirements of notice, hearing, and findings which are subject to judicial review. 1 Am.Jur.2d, Administrative Law, §§ 108, 154. 1 Davis, Administrative Law, § 2.10; 1 Cooper, State Administrative Law, Chap. III, Sec. 1, pp. 31–46. These protections are provided by the Administrative Procedures Act, SDCL 1–26.

Resources Journal, 316; Smith, *The Texas Compulsory Pooling Act*, 44 Texas L.Rev. 387; *Eleventh Annual Institute on Oil and Gas Law and Taxation*, 1960, 393–396; *Twenty-Third Annual Institute on Oil and Gas Law and Taxation*, 1972, 175–181.

The legislature has declared that it is the public policy to develop without waste a valuable natural resource of the state. One of the methods to prevent waste is through compulsory pooling of oil interests within a spacing unit. The legislature was well aware that several diverse interests might be involved which would have to be reconciled. It therefore required that, when requested, the Board should provide for the proportionate sharing of well costs by participating interest owners or alternatives for nondrilling interest owners to surrender their leasehold interests or to participate on a limited or carried basis on terms and conditions which are "just and reasonable." These standards, established by SDCL 45–9–33, are certainly equal, if not more precise, than those provided for the Board of Regents in *Boe v. Foss*, supra.

 Obviously, any of the three alternatives will vary under the circumstances, and all possible arrangements could not be anticipated. However, each of these alternatives is recognized within the oil and gas industry, and reasonable terms and conditions for each alternative will necessarily be based upon the facts as found by the Board. The term "limited or carried basis" as used in this statute was obviously intended to mean something other than a pro rata sharing of the well cost. If that were its intention, the legislature would have limited it to a pro rata basis as was done in SDCL 45–9–32. Furthermore, "limited or carried basis" is recognized in the oil and gas industry as an arrangement whereby the drilling party carries the nonparticipating owner by incurring all the costs of the operation in return for risk compensation.

The risk compensation used in voluntary pooling agreements has ranged from 50% to 300% according to the testimony given at the hearing.[5] Such agreements allow a leaseholder to avoid any loss if the drilling

5. Depco and Kohlman had made a previous voluntary agreement with a 250% risk compensation on a different spacing unit, the location of which is not apparent from the record.

is unsuccessful but allows the drilling party an incentive to bear the risk by granting a bonus if it is successful. The percentage of the risk penalty is based upon many factors, not the least of which is the proximity to other successful wells. Because Depco had a successful well within three quarters of a mile of the proposed drilling site, the Board set the risk compensation at 100%.

It appears that the 100% risk compensation was reasonable under the circumstances. Depco had requested that the risk compensation be set by the Board at 250%. This was the rate which they had previously proposed for a voluntary pooling agreement with Kohlman. Kohlman had rejected that offer and had counter-offered with a voluntary pooling agreement containing a 150% risk compensation provision. In fact, at no time has Kohlman contended that the 100% risk compensation was unreasonable, only that it was not authorized by SDCL 45–9–33.

We hold that the authority to set a risk compensation is necessarily implied and reasonably necessary to effectuate the power and duty of the Board to impose a compulsory pooling order where the alternative of a limited or carried basis is provided.[6] The judgment of the circuit court relating to the risk compensation is reversed and the matter is remanded to the circuit court with directions to enter judgment affirming the Board of Natural Resource Development Compulsory Pooling Order 1–74.

All the Justices concur.

6. Subject, of course, to the requirement that the terms and conditions be "just and reasonable."