**In the Matter of SAM OIL, INC., BHP Petroleum (Americas), Inc., and The Utah Board of Oil, Gas and Mining, Respondents.**

No. 900327.

Supreme Court of Utah.

July 26, 1991.

---

Steven W. Dougherty, Salt Lake City, for SAM Oil, Inc.

Alan A. Enke, John P. Harrington, Salt Lake City, for BHP Petroleum (Americas).

R. Paul Van Dam, Thomas A. Mitchell, Salt Lake City, for Bd. of Oil, Gas and Mining.

DURHAM, Justice:

SAM Oil, Inc., seeks a writ of review of a decision of the Utah Board of Oil, Gas and Mining ("the Board") in favor of BHP Petroleum, Inc. ("BHP"), which ruled that SAM Oil is not entitled to receive any revenue from BHP because SAM Oil's revenue in a certain oil and gas well is subject to offset by a 300 percent nonconsent penalty. SAM Oil also challenges the Board's denial of a petition for rehearing. The case raises questions regarding the imposition of a nonconsent penalty on SAM Oil, subsequent to its ratification of a voluntary operating agreement.

BHP is the suboperator of the Wasatch Participating Area. The Wasatch Participating Area is a subpart of the Roosevelt Unit Area, a federal oil and gas unit locat-

ed in Uintah and Duchesne Counties, Utah. BHP operates, and the participating area surrounds, the Roosevelt Unit # 6 well ("the well"). Drilling on the well commenced on September 11, 1983, and was successfully completed on January 6, 1984. At all relevant times, the operator of the Roosevelt Unit was Rio Bravo Oil Company ("Rio Bravo"). The unit was formed in the 1950s through two agreements. The unit agreement, dated November 7, 1950, joins the participating properties in the unit. The unit operating agreement, dated March 15, 1951, governs the relationship of the interest owners.

Although the well was not actually drilled on her land, at the time drilling commenced, Hazel Robertson owned an unleased interest in property which was within the boundaries of the unit and the smaller participating area surrounding the well. Robertson's predecessor in interest, like all of the other landowners within the unit boundaries, had the opportunity to be included in the unit when it was voluntarily formed in the 1950s. For unknown reasons, her interest was not joined. Prior to drilling the well, BHP's predecessor contacted the existing members of the participating area to see if they wanted to participate in the drilling of the well. In addition, some of the mineral interest owners who were within the participating area but had not joined the unit were contacted; Robertson was not among them.

On September 29, 1983, SAM Oil obtained an oil and gas lease from Robertson effective "as of first production." On November 2, 1983, the parties entered into a replacement lease effective August 29, 1983. In a letter dated October 6, 1983 (after drilling of the well commenced but before it was completed), SAM Oil, through its president Steve Malnar, expressed an interest in joining the unit. Malnar sent a second letter to Rio Bravo, dated October 25, 1983, stating that SAM Oil had "a desire to join the Unit as a working interest owner." At about the same time, Rio Bra-

vo sent a letter to SAM Oil describing the procedures for joinder. On January 4, 1984, Rio Bravo sent SAM Oil ratification and joinder documents to be signed by SAM Oil and Robertson, along with copies of the unit agreement and the unit operating agreement. Rio Bravo asked that SAM Oil return the signed documents and send evidence of Robertson's title. On February 15, 1984, Malnar did so. In December 1984, after the existing working interest owners gave their consent and upon the recommendation of the unit operator, the federal Bureau of Land Management approved the joinder of Robertson [1] and SAM Oil as members of the unit effective June 1, 1984.

On April 10, 1989, SAM Oil filed a petition with the Board seeking an order requiring BHP, as suboperator of the relevant participating area and the party responsible for distributing revenues from the well, to furnish an accounting of oil and gas revenues due SAM Oil from the well and to pay SAM Oil its proportionate share of the revenues less drilling, completing, testing, equipping, and operating costs. SAM Oil also sought interest and a statutory penalty of 25 percent under Utah Code Ann. § 40–6–9(7) for amounts unpaid. BHP responded that as a nonparticipating owner under section 9 of the unit operating agreement, SAM Oil was not due any money and was subject to a 300 percent penalty contained in the amended version of that agreement. After a hearing, the Board ruled in favor of BHP. SAM Oil filed a petition for rehearing, which was denied.

Pursuant to the terms of the Utah Administrative Procedures Act ("the UAPA"), see Utah Code Ann. §§ 63–46b–1 to –22 (1989 & Supp.1991), the proceeding at issue in this case was "commenced by or before an agency on or after January 1, 1988." Id. § 63–46b–22(1) (Supp.1991). We therefore review the Board's decision under the standards set forth in the UAPA. See generally id. § 63–46b–16(4) (1989).

---

**1.** The commitment of the lease to the unit permits the underlying royalty owner (in this case, Hazel Robertson) to receive a proportionate share of royalties from the entire unit as of the date of commitment. Robertson's receipt of her royalty is not affected by the outcome of this case.

As to findings of fact, the UAPA provides that we can grant relief to SAM Oil if we determine that SAM Oil has been substantially prejudiced by an agency finding of fact "not supported by substantial evidence when viewed in light of the whole record before the court." *Id.* § 63–46b–16(4)(g). Although SAM Oil raises numerous issues, it does not dispute those findings of fact which are material to the issues we address. For purposes of this case therefore, we need not examine the standard under the UAPA for reviewing agency findings of fact.

This case does, however, raise two basic questions of law: (1) Is SAM Oil subject to the risk penalty in section 9 of the unit operating agreement? and (2) if so, did the Board properly find that SAM Oil is subject to the 300 percent figure contained in the amended penalty provision rather than the 150 percent penalty contained in the unit operating agreement as originally executed? Under the UAPA, we review these questions to determine whether SAM Oil has been substantially prejudiced by an erroneous interpretation of the law. *See id.* § 63–46b–16(4)(d).

■ Recently, in *Savage Industries, Inc. v. Utah State Tax Commission*, 811 P.2d 664 (1991), this court looked at the effect of the UAPA upon the existing standard of review for agency decisions of law. In that case, we considered a question that was not based upon any technical expertise of the agency or upon the application of law to a complex, technical fact situation. The question there was one that the court was as competent to decide as the agency. We find the questions in the instant case to be of the same nature; they are purely questions of contract law. Under the analysis in *Savage*, our review is therefore under a correction of error standard. *Id.* at 669–70. This standard is the same as that applied before the UAPA was enacted. *Id.* at 666–67. We review the Board's order for cor-

rectness, giving no deference to its interpretation of the law. *Id.* at 670.

■ In section 9, the unit operating agreement provides for the circumstance in which the working interest owners cannot mutually agree on the drilling of a particular well. If the well is a dry hole, a nonparticipating owner loses nothing and owes nothing. The owner who does not participate in the cost of a *successful* well will not receive a proportionate share of the revenues from that well until the participating parties have been reimbursed in "an amount equal to the total accrued expense of operating such well plus one hundred and fifty (150%) percent of the cost of drilling, testing, completing and equipping such well." On April 27, 1983, a letter agreement increased the penalty from 150 percent to 300 percent. This type of penalty is typically called a "nonconsent penalty," a "risk penalty," or "risk compensation." *See Application of Kohlman*, 263 N.W.2d 674, 675 (S.D.1978). It is designed to ensure that nonparticipating owners do not benefit from the successful outcome of risks they do not take.

■ The unit operating agreement does not specifically discuss the costs of participation, either past or future, chargeable to a working interest owner who joins the unit after it is in operation.[2] Where it does not provide otherwise, a unit agreement may constitute a continuing offer to all persons with interests in tracts within the unit to join. Simmons, *Problems of the Tract in Which All or a Portion of the Interested Parties Do Not Agree on Unit Operation*, 3 Inst. on Oil & Gas L. & Tax'n 161, 167 (1952). This does not mean, however, that the offer must be construed as being open for acceptance for an indefinite period of time and under changed circumstances. *Id.* The rights of an owner to join a voluntary unit at a later date must be determined in each instance on the facts and circumstances existing at that time.

---

2. In section 27, the unit agreement outlines the procedure for a "non-working interest owner" to join the unit. That agreement does not, however, address the question of the financial obligations of the subsequently joining party, stat-

ing only that the right of subsequent joinder is subject to such requirements or approvals as may be provided in the unit operating agreement.

*Id.* "Owners of royalty or unleased mineral interests are entitled to come into a unitization program under fair, reasonable, and equal terms with other participants in the unit, similarly situated." *California Co. v. Britt,* 247 Miss. 718, 154 So.2d 144, 150 (1963).

■ If SAM Oil had joined the unit originally, then when the drilling of the well was later proposed, Malnar would have been required to make an election under section 9 of the unit operating agreement. SAM Oil did not join until after the well was successfully completed. To join the unit, however, Malnar executed a "ratification and joinder" of the unit agreement. In that document, SAM Oil "expressly joins said Unit Agreement and ratifies, approves and adopts, and confirms said Unit Agreement as *fully as though the undersigned had executed that original instrument.*" (Emphasis added.) In section 27, the unit agreement makes subsequent joinder subject to the requirements of the unit operating agreement. This is, then, a matter of contract law, and it is inconsistent for SAM Oil to now claim that it is not subject to the risk penalty of section 9 just as an original party would have been.[3]

In return for SAM Oil's commitment, through the ratification agreement, to be subject to the unit operating agreement as an original party, SAM Oil was allowed to join the unit subsequent to the successful drilling of the well. It is inconceivable that BHP and the working interest owners would have approved the joinder so soon after the well had been successfully completed had they not assumed and expected that SAM Oil would be subject to the risk penalty. In executing the ratification agreement, SAM Oil had notice of, and agreed to be bound by, the risk penalty provision in the unit operating agreement.

Moreover, under the circumstances of this case, the requirement of risk compensation should not be affected by the fact that the well was in existence when SAM Oil joined the unit. *See Superior Oil Co. v. Humble Oil & Refining Co.,* 165 So.2d 905, 908 (La.Ct.App.1964). The timing of SAM Oil's joinder in the unit was due in part to its own delay. "[D]elay in entering the unit may affect the degree of participation if there is a reasonable basis for that element." *California Co. v. Britt,* 154 So.2d at 150. Prior to the commencement of drilling, Malnar knew of Robertson's unleased interest. Moreover, he knew that the well would be drilled. Had Malnar acted more quickly, it is likely that SAM Oil could have joined the unit and participated in the drilling costs (and revenues) from the outset. Malnar never tendered any money toward SAM Oil's share of the costs of the well. When he voluntarily requested that SAM Oil be allowed to join a unit containing a well already successfully completed, SAM Oil in effect entered into a joint venture with the participating working interest owners. *See Superior Oil Co. v. Humble Oil & Refining Co.,* 165 So.2d at 908.[4] Where Malnar

---

**3.** It is ironic that SAM Oil does not dispute that it is liable for a proportionate share of the costs of drilling, completing, testing, equipping, and operating the well. Section 7 of the unit operating agreement provides that the working interest owners who elect to participate in the drilling of a well must promptly pay their proportionate share of costs and expenses to the unit operator. Section 9 of that agreement, on the other hand, provides that *nonparticipating* working interest owners will have their share of the costs and expenses—plus the risk penalty— deducted from their proportionate share of production. SAM Oil cannot be responsible for drilling and operating costs as a *participating* working interest owner; it did not participate in the drilling at a time when there was risk to be borne. SAM Oil must therefore be deemed to be responsible for drilling costs as a *nonpartic-*

*ipating* working interest owner. It would be inconsistent to have drilling costs deducted from SAM Oil's share of the revenues, as is the case with other nonparticipating working interest owners, but exempt it from the risk penalty associated therewith.

**4.** We agree with SAM Oil that the case of *Traverse Oil v. Natural Resources Commission,* 153 Mich.App. 679, 396 N.W.2d 498 (1986), is similar to the case at bar. We think, however, that petitioner overlooks important differences between the two cases. In *Traverse Oil,* the court ruled that the state improperly imposed a risk penalty on a party who was *forced* to join his interest with others under a compulsory pooling order. Producing wells had been drilled prior to the entry of the order. The court found that

knew about the drilling in advance but delayed taking action to obtain a lease from Robertson and join the unit, SAM Oil cannot now complain that it is admitted to membership under conditions intended to compensate the other working interest owners for the risk which SAM Oil avoided by its delay.

■ SAM Oil should not be able to acquire the benefits of partial ownership without first compensating the existing working interest owners for the risk they took in drilling the well. If the well had been unsuccessful, a subsequently joining party would not have had to absorb any of the costs of drilling. It would unfairly injure the participating working interest owners to require them to absorb all the losses from the well but force them to share the profits. Such a result would encourage owners who might otherwise contribute to the costs of a well in advance to hold out until the results of drilling become known, because they would then be able to obtain the benefits of the well without the risks. B. Kramer & P. Martin, *The Law of Pooling and Unitization*, § 12.01 (3d ed. 1989). Moreover, because SAM Oil seeks to have the drilling and operating costs taken out of its share of production,

if SAM Oil obtains the relief it seeks, the participating owners would be required to carry SAM Oil's proportionate costs during the time required to obtain reimbursement from the proceeds of production, without the additional compensation the risk penalty provides.[5]

In its conclusions of law, the Board found that "as a rule," a party who joins a unit subsequent to the commencement of a well would be subject to a nonconsent penalty. The Board cites no authority on this point, and we are not aware of any. We therefore think the Board's statement that this is a general rule is too broad. We also think, however, that as a matter of contract law, the application of a risk penalty was proper under the circumstances of this case. Although the Board may have erroneously interpreted the law with regard to this question, SAM Oil was not prejudiced by the error.

■ Finally, SAM Oil alleges that assuming a risk penalty *is* applicable, it should be assessed at the original 150 percent level rather than at the amended 300 percent amount. There does not seem to be any dispute over the validity of the April 1983 amendment increasing the nonconsent penalty from 150 to 300 percent.[6] There is

---

the penalty was improper because the penalized party "was not afforded the opportunity to participate in the drilling costs and avoid the penalty because the wells were completed before pooling was ordered." 396 N.W.2d at 505.

Although in the case at bar SAM Oil joined the unit after the drilling of the well, the well was drilled some thirty-three years after the unitization of the interests. While the joinder was to a preexisting entity, the terms of the unit operating agreement are private contractual arrangements entered into voluntarily by the parties. Malnar had knowledge of the terms of the agreement before he ratified it; SAM Oil is now bound by them. In *Traverse Oil*, the terms were imposed on the party by compulsory state action. It is doubtful that a penalty assessment could meet constitutional standards of due process when the penalized party was not given an opportunity to participate in the drilling. *See* B. Kramer & P. Martin, *The Law of Pooling and Unitization*, § 12.03[2][c] (3d ed. 1989). We think, however, that SAM Oil effectively waived any due process argument by consenting to the terms of the ratification agreement.

5. As a nonparticipating working interest owner, SAM Oil may have its share of drilling and

operating costs taken out of production. But to obtain that benefit, it will also be subject to the risk penalty described in section 9 of the unit operating agreement. SAM Oil's working interest share of production from the well should not have begun to accrue, however, until after it became a member of the unit. In section 27, the unit agreement is clear that a subsequent joinder is only effective as of the first day of the month following the filing of the appropriate papers with the Bureau of Land Management. Nothing in the unit operating agreement or the ratification document signed by Malnar indicates that there is a different effective date.

6. Nor is there a question regarding the reasonableness of the 300 percent penalty under the circumstances of this case. Under standard practice in the oil and gas industry, risk penalties in voluntary unitization agreements may range from 50 percent to as much as 1,000 percent. *See* H. Williams & C. Meyers, *Manual of Oil & Gas Terms* 613 (1987); *Application of Kohlman*, 263 N.W.2d at 678. The percentage of the penalty is based on many factors relative to the risk of the well, including its proximity to other producing wells, whether it is offshore or

a dispute, however, over whether Malnar had notice of the amendment at the time of SAM Oil's ratification. In its findings of fact, after discussing the transmission of the ratification documents to be signed by SAM Oil and Robertson, the Board states, "SAM Oil maintains that the April 27, 1983 amendment to the Unit Operating Agreement was not included with these materials.[7] BHP maintains that it was standard procedure to include all amendments."[8] Over the dissent of one member, the Board's conclusions of law state, "SAM Oil is subject to the 300% nonconsent penalty provided in the Unit Operating Agreement, as amended." We cannot find a logical connection between the Board's findings of fact and its conclusion of law. The Board's findings of fact do not expressly state whether SAM Oil received notice of the amendment prior to executing the ratification agreement; yet implicit in its conclusion of law is the premise that Malnar *did* have notice of the amendment.

We are unable to review the amount of the penalty imposed by the Board without a further finding of fact regarding whether SAM Oil, through Malnar, had notice of the amendment. Because this is a question depending in part on credibility, we remand for clarification. Depending on its finding regarding notice, the Board should enter an order holding that SAM Oil is subject to its proportionate share of the costs and the risk penalty (at either the 150 or the 300 percent level) described in section 9 of the unit operating agreement. The order should further provide that SAM Oil's working interest share of production from the well began to accrue on the first day of the month following the filing of the appropriate papers with the Bureau of Land Management pursuant to section 27 of the

unit agreement. Finally, based on the revised date of accrual, the Board will need to reconsider whether the well has yet paid out the appropriate costs and penalty and therefore whether SAM Oil is owed any proceeds from production to date.

HALL, C.J., HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.

---

onshore, and the depth to which it is to be drilled. The well at issue in this case was a relatively deep, exploratory well. The 300 percent risk compensation was therefore reasonable under the circumstances, and at the hearing, there was expert testimony to this effect.

7. Although there is evidence that Malnar was subsequently made aware of the amount of the amended penalty, BHP presented no evidence to the Board that he knew of the amendment at the time of the ratification. The cover letter

dated January 4, 1984, does not refer to the 1983 amendment.

8. The weight of this allegation is misleading because it was *not* BHP who corresponded with Malnar concerning SAM Oil's joinder of the unit; it was the unit operator, Rio Bravo. While perhaps enlightening on the subject of industry practice, BHP's standard procedure does not have any direct relevance to the question in this case.