#27147-rev & rem-SLZ

**2015 S.D. 27**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE PETITION
OF LUFF EXPLORATION COMPANY,
DENVER, COLORADO, FOR AN
ORDER POOLING ALL INTERESTS IN
A SPACING UNIT FOR THE SOUTH
MEDICINE POLE HILLS FIELD
DESCRIBED AS THE E/2 OF SECTION
33 AND THE W/2 OF SECTION 34,
TOWNSHIP 23 NORTH, RANGE 4
EAST AND THE NW/4 OF SECTION 3
AND THE NE/4 OF SECTION 4,
TOWNSHIP 22 NORTH, RANGE 4
EAST, HARDING COUNTY, SOUTH
DAKOTA, AND TO AUTHORIZE THE
RECOVERY OF RISK COMPENSATION
IN ADDITION TO THE PRO RATA
SHARE OF REASONABLE ACTUAL
COSTS FROM THE INTEREST OF ANY
LESSEE OR UNLEASED MINERAL
OWNER WHO ELECTS NOT TO
PARTICIPATE IN THE RISK AND COST
OF DRILLING AND COMPLETING A
WELL ON SAID SPACING UNIT; AND
FOR OTHER RELIEF AS THE BOARD
DEEMS APPROPRIATE.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARK BARNETT
Judge

* * * *

ARGUED FEBRUARY 18, 2015

OPINION FILED **05/06/15**

SCOTT SUMNER
Rapid City, South Dakota

Attorney for appellant
Linda Golden.


JOHN W. MORRISON of
Crowley Fleck, PLLP
Bismarck, North Dakota

    and

BRETT M. KOENECKE of
May, Adam, Gerdes & Thompson, LLP
Pierre, South Dakota

Attorneys for appellee Luff
Exploration Company.


MARTY J. JACKLEY
Attorney General

RICHARD M. WILLIAMS
Assistant Attorney General
Pierre, South Dakota

Attorneys for appellee
South Dakota Department of
Environment and Natural
Resources.

#27147

ZINTER, Justice

[¶1.]　　　　Linda Golden owned a mineral interest that was within a "spacing unit"[1] in which Luff Exploration Company desired to drill for oil. Because Golden rejected Luff's offer to lease her mineral interest or participate in the cost of drilling, Luff petitioned the South Dakota Board of Minerals and Environment (Board) to "compulsory pool"[2] the mineral interests in the spacing unit. Luff also sought "risk compensation"[3] from Golden. Over Golden's objection, the Board granted Luff's petition for compulsory pooling and risk compensation, and the circuit court affirmed. On appeal to this Court, Golden argues that the Board erred

1.　　　"When necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights, the Board of Minerals and Environment shall establish spacing units for a pool . . . ." SDCL 45-9-20. A "pool" is "an underground reservoir containing a common accumulation of oil or gas or both[.]" SDCL 45-9-2(10). Orders establishing spacing units for pools "specify the size and shape of each unit and the location of the permitted well thereon in accordance with a reasonable uniform spacing plan, with necessary exceptions for wells drilled or drilling at the time of the filing of the application." SDCL 45-9-26.

2.　　　Pooling is "[t]he bringing together of small tracts of land or fractional mineral interests over a producing reservoir for the purpose of drilling an oil or gas well." *Black's Law Dictionary* 1348 (10th ed. 2014). Compulsory pooling occurs when the pooling is "done by order of a regulatory agency." *Id.* Its purpose "is to prevent the physical and economic waste that accompanies unnecessary wells . . . [and] to protect the correlative rights of landowners over a reservoir." 6 Howard R. Williams and Charles J. Meyers, *Oil and Gas Law* § 901 (1990).

3.　　　In the oil and gas industry, "risk compensation"—also known as "risk bonus," "risk penalty," or "compensation for risk"—"is intended to relieve the nondrilling interest owner from having to advance his proportionate share of the drilling costs but provide extra compensation from production (if oil is found) to the drilling party who has advanced the entire drilling costs and who would absorb the entire cost of a 'dry hole.'" *Application of Kohlman*, 263 N.W.2d 674, 675 (S.D. 1978).

-1-

in failing to order a time and manner for Golden to elect to participate in the well by paying her proportionate share of the cost of drilling, equipping, and operating the well. Golden also argues that Luff was not entitled to risk compensation. We reverse and remand.

*Facts and Procedural History*

[¶2.] The Secretary of the Department of Environment and Natural Resources (DENR) issued an order that established a 960-acre spacing unit for oil drilling in the South Medicine Pole Hills field in the Red River B reservoir in Harding County. Golden owned a 50% mineral interest in two lots—totaling eighty acres—in that spacing unit. Luff planned to drill a horizontal well for oil, and Golden was the only mineral owner in the spacing unit who had not leased her interest or agreed to participate with Luff in the cost of the well.

[¶3.] Golden and Luff had a pre-existing relationship regarding oil and gas production. Luff operated another well in which Golden was an unleased mineral owner. Golden chose not to lease or participate in the prior well and was forced to pool her interest with Luff and pay 100% risk compensation.

[¶4.] Clayton Chessman, an oil and gas "landman" employed by Luff, interacted with Golden on the well at issue in this case. Chessman emailed Golden on June 25, 2013, proposing to lease her mineral interest. Luff offered $100 per net acre with a one-sixth royalty for a three-year primary term. Luff indicated that it preferred to lease Golden's interest because if it "force pooled" her interest, Golden would be responsible for risk compensation. Golden did not respond to Chessman's email.

[¶5.] On July 17, 2013, Chessman sent Golden a certified letter and an email, which had the June 25 email attached. Chessman disclosed the estimated costs of drilling and included an "authority for expenditure" in the event Golden elected to participate. Alternatively, in the event Golden elected to not participate, Chessman offered to double Luff's lease to $200 per net acre. Chessman also attached a proposed lease. The increased offer was also in Chessman's email. Golden was requested to make her election within thirty days of July 17, 2013. Chessman warned Golden that if she did not lease or elect to participate, Luff would request the Board to authorize the recovery of risk compensation from Golden.

[¶6.] On July 18, 2013, Golden emailed Chessman declining Luff's offer regarding the well. Golden stated: "Thank you for your generous offer. I have spoken with my attorney . . . and decided that I want to continue my status as an unleased mineral interest [owner]." Although Golden did not receive the letter until July 25, 2013, she did not change her position.

[¶7.] Luff, for its own logistical reasons, had decided to proceed with drilling before obtaining a pooling order. Luff applied for a permit to drill the well on July 2, 2013. The permit was issued on July 11, 2013. On July 23, 2013, Luff petitioned the Board for the compulsory pooling order. Notice, including the opportunity for hearing, was sent to interested persons. Luff began drilling on July 28, 2013. At that time, Luff did not have a lease or voluntary pooling agreement with Golden, and Luff had not obtained the compulsory pooling order.

[¶8.] Golden received notice of the compulsory pooling order request on August 9, 2013. On August 28, 2013, Golden filed a petition to intervene. A

contested case proceeding was scheduled for October 17, 2013. At the time of the hearing, the well had been successfully drilled, but it had not been made operational.

[¶9.] Chessman was the only witness to testify at the hearing. He testified that because the well had already been drilled, Golden received an advantage over other mineral interest owners: she knew the well was mechanically successful. He also testified that the lease terms offered were reasonable and were based upon lease terms negotiated with another mineral owner in the spacing unit. Chessman further testified that the thirty-day time period to make an election to lease or participate was reasonable and in accord with the practice in the oil and gas industry. Golden did not dispute the reasonableness of Luff's terms.

[¶10.] Chessman also testified regarding the risks associated with drilling and development of oil wells.[4] Even though mechanical drill risks had been resolved in this case because the well had been drilled, risks of production still existed. Chessman testified that some wells in the Red River B reservoir were successful and others produced too much water or were otherwise not economically feasible to operate. Therefore, Chessman testified that 100% risk compensation was not only reasonable, but was low considering industry standards. Chessman "[had not] seen anything less than 300 percent [risk compensation] in many years, and more recently with the horizontal drilling [he had] seen it as high as 4[00] and 500%."

---

4.    Chessman's testimony was disputed through cross-examination.

[¶11.] At the conclusion of the hearing, the Board issued a compulsory pooling order. The Board also found that 100% risk compensation was just, reasonable, and should be paid by Golden. The order did not contain a provision setting a time and manner for Golden to elect to participate in the well.

[¶12.] Golden appealed to the circuit court, which affirmed the Board's decision. Golden now appeals to this Court, arguing that the Board erred in not ordering a time and manner in which Golden could elect to participate in the well. Golden also argues that she should not be subject to risk compensation. Golden contends that risk compensation should not have been awarded because: (1) the Board erred in finding that Luff made an unsuccessful, good-faith attempt to have Golden participate in the well, (2) Luff had already drilled the well, and (3) 100% risk compensation was arbitrary, unjust, and unreasonable.[5]

*Decision*

[¶13.] Golden first argues that the Board erred in granting a pooling order that contained no provision specifying a time and manner for her to elect to participate. SDCL 45-9-32 provides:

> Each such pooling order shall authorize the drilling, equipping, and operation of a well on the spacing unit; shall provide who may drill and operate the well; *shall prescribe the time and manner in which all the owners in the spacing unit may elect to participate in such well drilling, equipping, and operation;* and shall provide for payment of the reasonable actual cost of the well drilling, equipping, and operation by all those who elect to

---

5. "Our standard of review is governed by SDCL 1-26-37. The agency's findings are reviewed for clear error. . . . Questions of law are . . . reviewed de novo." *Martz v. Hills Materials*, 2014 S.D. 83, ¶ 14, 857 N.W.2d 413, 417 (citations omitted). We also review statutory interpretation de novo. *Trumm v. Cleaver*, 2013 S.D. 85, ¶ 8, 841 N.W.2d 22, 24.

> participate, plus a reasonable charge for supervision and interest.

(Emphasis added.) Golden contends that the emphasized language requiring that the order "shall" contain a provision prescribing a time and manner for her to "elect to participate" was mandatory.

[¶14.]    Luff responds that an elect-to-participate term was not required in the pooling order in this case because Golden had elected not to participate when she rejected Luff's offer before the hearing. Luff contends that the statute "clearly presumes" the election requirement applies only if the owner has not made an election prior to the hearing. Luff points out that the Board found "Golden's response and position was clearly unequivocal that she wished to continue her status as an unleased mineral interest [owner]." Therefore, Luff contends that Golden had elected not to participate before the hearing and there was no need to prescribe a time and manner to elect to participate after the hearing. We disagree.

[¶15.]    SDCL 45-9-32 is unambiguous. It contains no language permitting the Board to waive the opportunity to participate in cases where owners have declined to participate prior to the hearing. On the contrary, the statute contemplates future conduct. It provides that in pooling proceedings "[e]*ach* . . . pooling order . . . *shall* prescribe the time and manner in which *all the owners* in the spacing unit *may elect* to participate in such well drilling, equipping, and operation[.]" (Emphasis added.) Thus, the Board was required to include in its order a time and manner for Golden to elect to participate. Concededly, in this case, such a provision allows Golden to know the results of the drilling before making her election. But the order prescribing a time for participation may only be issued after a hearing in cases

where an owner has objected. *See* SDCL 45-9-31. Therefore, any advantage Golden obtained by knowing the results of the drilling accrued only because Luff elected to drill before it obtained a pooling order.[6] We conclude that the Board failed to comply with the plain language of SDCL 45-9-32.[7]

[¶16.]        Luff, however, argues that SDCL 45-9-32 should be "harmonized" with ARSD 74:12:10:01, which implements the statute. The rule allows a driller in a pooling proceeding to obtain risk compensation "from an owner who elects not to participate."[8] *See id.* The rule provides that risk compensation may be obtained

---

6.    Luff acknowledged that it had given Golden this advantage. Chessman testified that Luff gave Golden thirty days to respond to their offer even though they were going to drill before the time to respond expired. Chessman acknowledged that "meant that [Luff was] assuming some of the risk in the initial drilling by giving her the full 30 days even though [Luff] had commenced [drilling.]"

7.    This case involves an owner who had declined to lease or participate before the hearing. We express no opinion on those cases where an owner has contracted to lease or participate before the hearing.

8.    ARSD 74:12:10:01 provides:

> In an application for a compulsory pooling order made pursuant to SDCL 45-9-31, the applicant may request the board to provide for the recovery of risk compensation, in addition to actual prorated costs, from an owner who elects not to participate in the risk and cost of drilling and operating a well in an established spacing unit. Before an order is entered with such a provision, the applicant must:
>
>> (1) Provide proof that an unsuccessful, good-faith attempt was made to have the nonparticipating owner execute a lease or participate in the risk and cost of drilling and operating the well; and
>>
>> (2) Notify the nonparticipating owner with proof of service that the applicant intends to request the board to provide for the recovery of risk compensation and that the

(continued . . .)

only upon proof that a "good-faith attempt *was made* to have the nonparticipating owner execute a lease or participate in the risk and cost of drilling and operating the well[.]" *Id.* (emphasis added). Unlike the statute, this rule looks to the past to determine if a good-faith attempt was made to obtain a lease or participation agreement. Considering the past-tense language of the rule, Luff contends the "elect" language of the statute should be interpreted to be a condition precedent that only refers to mineral interest owner's elections made prior to the pooling hearing. Luff argues that the condition precedent was satisfied in this case because Golden had indicated she desired to remain an unleased mineral interest owner before the hearing. Therefore, Luff contends that the statute did not require the order to provide a time and place for Golden to elect to participate after the hearing.

[¶17.]     The rule, however, does not set the time in which mineral interest owners must make the election. More importantly, an administrative regulation cannot adopt requirements that "expand upon the statute that it purports to implement." *State Div. of Human Rights, ex rel. Ewing v. Prudential Ins. Co. of Am.*, 273 N.W.2d 111, 114 (S.D. 1978). "Furthermore, 'rules adopted in contravention of statutes are invalid.'" *Paul Nelson Farm v. S.D. Dep't of Revenue*, 2014 S.D. 31, ¶ 24, 847 N.W.2d 550, 558 (quoting *In re Yanni*, 2005 S.D. 59, ¶ 16, 697 N.W.2d 394, 400). Luff's interpretation of the rule would not only expand the statute, it would nullify SDCL 9-45-32's requirement that the pooling *order*, which

---

(. . . continued)

nonparticipating owner may object to the risk compensation provision by responding in opposition to the application for the compulsory pooling order.

can only be issued after a hearing in this type of involuntary pooling case, contains a provision allowing each owner in the spacing unit a time and manner in which they "may elect" to participate.[9]

[¶18.]     We reverse and remand to the Board for entry of a pooling order that affords Golden a time and manner of electing to participate by paying her proportionate share of the cost of drilling, equipping, and operating the well. Although Golden also requests that we determine the issue of risk compensation, that issue will be mooted if Golden elects to participate. Therefore, we decline to address that issue.

[¶19.]     GILBERTSON, Chief Justice, and SEVERSON, WILBUR, and KERN, Justices, concur.

---

9.     At oral argument, DENR suggested that such an interpretation could create a constitutional problem because mineral owners who voluntarily contracted to participate or lease might claim a "taking" if better terms became available under a Board's subsequent pooling order. DENR did not, however, explain how a taking can occur following an owner's voluntary contractual agreement alienating property rights. Additionally, the plain language of the statute controls our interpretation.